346 A.2d 269

**WM. PENN PARKING GARAGE, INC., et al.**

**v.**

**CITY OF PITTSBURGH, Appellant.**

Supreme Court of Pennsylvania.

Argued March 10, 1975.

Decided Oct. 3, 1975.

170

172

174

176

Grace S. Harris, Mead Mulvihill, Jr., Dept. of Law, Pittsburgh, for appellant.

Leonard Boreman, Richard H. Martin, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, for appellees.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

ROBERTS, Justice.

On January 26, 1973, the City of Pittsburgh adopted an ordinance imposing a tax on all patrons of "non-residential parking places" in the amount of 20% of the consideration paid for storage of any vehicle in such a parking place. On February 14, 1973, this appeal from adoption of the ordinance, pursuant to section 6 of the Local Tax Enabling Act,[1] Act of December 31, 1965, P.L. 1257, as amended, 53 P.S. § 6906 (1972) (the Act),[2] was brought by nine operators of commercial parking facilities and fifty-five other persons.[3]

1. This Act is popularly known as the "Tax Anything Act."

2. That section provides, in pertinent part:
 "No tax levied for the first time by any political subdivision to which this act applies shall go into effect until thirty days from the time of the adoption of the ordinance or resolution levying the tax. Within said thirty days, taxpayers representing twenty-five percent or more of the total valuation of real estate in the political subdivision as assessed for taxation purposes, or taxpayers of the political subdivision not less than twenty-five in number aggrieved by the ordinance or resolution shall have the right to appeal therefrom to the court of quarter sessions of the county . . . . The petition shall set forth the objections to the tax and the facts in support of such objections . . . . .
 "No such appeal shall act as a supersedeas unless specifically allowed by the court to which the appeal is taken or a judge thereof.

 . . . . . . . . .

 "It shall be the duty of the court to declare the ordinance and the tax imposed thereby to be valid unless it concludes that the ordinance is unlawful or finds that the tax imposed is excessive or unreasonable; but the court shall not interfere with the reasonable discretion of the legislative body in selecting the subjects or fixing the rates of the tax. The court may declare invalid all or any portion of the ordinance or of the tax imposed or may reduce the rates of tax."

3. Seven of the nine parking operators are corporations, the other two being unincorporated businesses. The remaining plaintiffs are all individuals, described in the complaint simply as "residents" and "taxpayers" of the City. Those other than the parking operators will be referred to collectively as "individual plaintiffs."

The City filed preliminary objections in the nature of a demurrer contending that (1) none of the plaintiffs were "taxpayers . . . aggrieved by the ordinance" authorized by section 6 to appeal from its adoption, (2) section 6 is an unconstitutional delegation of taxing power to the judiciary "insofar as it permits a court to determine the reasonableness of a tax rate and to reduce any rate it finds unreasonable without providing standards to guide the court's determination," and (3) the petition failed to state a cause of action. The court of common pleas sustained the objections on both of the first two grounds asserted by the City. It therefore dismissed the petition without leave to amend.

The plaintiffs appealed to the Commonwealth Court. They admitted certain formal defects in their petition, but contended that they should have been permitted to correct these by amendment.[4] On this basis, they argued that the trial court had erred as to both substantive grounds on which it based the dismissal of the petition. The Commonwealth Court agreed with them and reversed. *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 11 Pa.Cmwlth. 507, 314 A.2d 322 (1974). Because of the importance of the issues involved to the administration of the Act, we allowed this appeal.[5] We affirm the order of the Commonwealth Court.

Part I of this opinion will consider the contentions of the City relating to the trial court's refusal to allow

4. Specifically, they admit that the individual plaintiffs should have been described as "parking taxpayers" rather than simply "taxpayers" in order to establish that they are "aggrieved" by the ordinance. The court of common pleas noted that there was no allegation describing the manner in which the individual plaintiffs were aggrieved but assumed that they were subject to the tax imposed by the ordinance. Because it concluded that this was insufficient to render them "aggrieved" by the ordinance, it found that no purpose would be served by an amendment to that effect.

5. See Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 204(a), 17 P.S. § 211.204(a) (Supp.1975).

amendment, a question which assumes peculiar impor-
tance in the procedural setting of this litigation. Part II
will resolve the dispute over standing of the plaintiffs to
maintain this statutory appeal. Part III will deal with
the claim that the Act has unconstitutionally delegated
legislative power to the judiciary.

## I

It is now agreed that the petition is formally defective
because it fails to allege any manner in which the indi-
vidual plaintiffs are "aggrieved by the ordinance," [6]
though it has been assumed at all stages of the proceed-
ings that they are individuals who are liable for the tax
imposed by the ordinance.[7] The City maintains that this
formal defect is fatal to the petition because the trial
court properly refused to allow amendment.

If the trial court were correct in refusing to allow the
amendment, the City's position would be well taken be-
cause the Act requires "taxpayers representing twenty-
five percent or more of the total valuation of real estate
in the political subdivision . . . or taxpayers of the
political subdivision not less than twenty-five in number
aggrieved by the ordinance" to bring an appeal under
section 6.[8] If the individual appellants are not permitted
to allege the basis on which they are "aggrieved by the
ordinance," only the parking operators would remain and
they are fewer than 25 in number. Because there is no
claim that the plaintiffs own "twenty-five percent or
more of the total valuation of real estate" in the City, the
petition would then fail to comply with the threshold re-
quirements of section 6. However, we conclude that the
trial court was not correct in refusing to allow amend-
ment.

6. See note 4 supra.
7. Appellees represent in their brief that this assumption is cor-
 rect.
8. See note 2 supra.

The City's argument on this point is twofold. It argues, first, that no amendment to a petition under section 6 is permitted after the thirty-day period allowed for filing such petitions. Second, even if the statute permits a petition to be amended after expiration of the thirty-day period, the City argues that the trial court did not abuse its discretion in refusing to allow amendment. We find no merit in either contention.

The City argues that the brief period allowed for the taking of appeals under section 6 is intended to promote early determination of the validity of taxing ordinances in order to minimize the uncertainty which would otherwise affect budgetary planning. See *Alco Parking Corp. v. City of Pittsburgh,* 6 Pa.Cmwlth. 433, 446, 291 A.2d 556, 563, 295 A.2d 349 (1972) (dictum), rev'd on other grounds, 453 Pa. 245, 307 A.2d 851 (1973), rev'd on other grounds, 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974); *Jones v. Oxford School District,* 3 Pa.Cmwlth. 102, 108, 281 A.2d 188, 191 (1971) (laches will bar equitable action to enjoin collection of a tax). From this proposition the City argues that taxpayers proceeding under section 6 should not be permitted to amend their petitions after expiration of the thirty days allowed for commencement of an appeal. However, the only direct support offered for this position is *Archbold v. Codorus Township School District,* 33 Pa.D. & C.2d 311, 315–16 (Q S.York 1963) (dictum).

Apparently recognizing the weakness of its position, the City seeks to bolster its argument by reliance on two cases involving elections. *Pietrowski Nominating Petition,* 24 D. & C.2d 239 (C.P. Philadelphia 1961); *Williams v. Todman,* 367 F.2d 1009 (3d Cir. 1966).[9] *Pie-*

9. *Williams* was a proceeding under the Virgin Islands Code to set aside a nomination petition. Because the relevant provisions of the Virgin Islands Code had been modeled upon the Pennsylvania Election Code, the court looked to Pennsylvania cases for guidance in its construction. The City therefore offers it as persuasive authority as to the content of Pennsylvania election law,

*trowski* refused to allow amendment of a motion to strike a nominating petition to cure a failure to specify the signatures attacked after expiration of the time allowed for filing objections to such petitions. In *Williams,* a petition to set aside a nominating petition was filed on September 12, the last day on which such petitions were permitted. However, it was not presented to any judge for action, as required by statute, until September 24, immediately after an amended petition was filed. Because the statute required that hearings on such petitions be conducted not later than September 16 and final determinations be made not later than September 21, the court of appeals held that the district court was powerless to act when the petition was presented to the court on September 24. It also held that the petition was barred by failure of the plaintiff to prosecute it with due diligence. Finally, the court noted that the petition, as originally filed, was defective because it failed to set forth specifically the plaintiff's objections. It then held, relying on *Pietrowski,* that the amendment of the petition could not cure the defect because the amendment was filed too late.

Assuming that these cases correctly hold that defects in a challenge to a nominating petition may not be cured by amendment after expiration of the time allowed for filing of such challenges,[10] we conclude that they are distinguishable. The peculiar reasons for requiring rigid adherence to statutory time limits are well stated by the opinion in *Williams*:

> "[T]he time limits fixed by section 412 are mandatory and not merely directory, since that section is in-

which it then seeks to analogize to proceedings under section 6 of the Act.

**10.** Because the amendment in *Williams* was not filed until after the date fixed by statute for final *determination* of challenges to nominating petitions, it is not clear that *Williams* does hold that amendment is impermissible after expiration of the time for *filing* of challenges.

tended to provide the efficient procedure for the speedy determination of controversies regarding nomination petitions which is absolutely essential if political campaigns are to proceed in order and primary and general elections are to be held without confusion, or even at all.

"That this must necessarily be the construction to be placed upon the Virgin Islands statute is highlighted by the situation in which we find ourselves today. For although we heard argument in this appeal only 10 days after it was docketed and only 16 days after the order appealed from was entered, our decision, rendered with the greatest dispatch, comes down only 13 days before the day of the general election in the Virgin Islands. And it must be remembered that this proceeding is an attack upon nomination petitions filed in behalf of candidates who might have had to run in a primary election on October 4th, the very day on which the district court heard and decided the matter, if such a primary election had been required. It hardly needs to be added that if the court had set aside the petition the Republican primary election, which in that event would have been required by 18 V.I.C. § 359 to be held on October 4th, could not actually have been held. Indeed it would have been difficult enough to prepare for and hold such a primary election on October 4th even if the district court had set aside the petition on September 21st, the last day for such action fixed by section 412."

367 F.2d at 1012–13.

However great the need for prompt determination of the validity of a tax, it cannot be compared with the exigencies resulting from the need to conduct an election on a specific date, fixed in advance. Consequently, we conclude that *Pietrowski* and *Williams* have no application in this case.

We hold that section 6 does not preclude amendment of a petition after expiration of the period allowed for commencing an appeal. We base this conclusion on two factors. First, the rule argued for by the City encourages hyper-technicality and formalism in pleading, contrary to the modern practice of allowing free amendment in order to promote resolution of cases on their merits. See, e. g., *Schaffer v. Larzelere*, 410 Pa. 402, 406–07, 189 A.2d 267, 270 (1963); Pa.R.Civ.P. 126, 1033; Fed.R.Civ.P. 1, 15(a) & (b). Second, the proposed restriction of amendments would tend to defeat, rather than promote, a prompt determination of the validity of a taxing ordinance.

In its brief, the City speaks in terms of taxpayers "delaying" a tax by proceedings under section 6. However, section 6 specifically provides that "[n]o . . . appeal shall act as a supersedeas unless specifically allowed by the court to which the appeal is taken or a judge thereof." [11] Because no supersedeas has ever been allowed in this case, there has been no disruption of collection of the tax involved.

The interest of the municipality which is served by prompt determination of the validity of the tax is the ability to plan its budget. The municipality should know if the tax is invalid as promptly as possible so that it may consider other sources of revenue. This interest cannot be served by a dismissal of an appeal brought under section 6 on a ground unrelated to the merits unless all other challenges to the validity of the ordinance are foreclosed. If other challenges are not foreclosed, dismissal of an appeal under section 6 simply defers the determination of validity to a later proceeding.

In fact, avenues of attack other than section 6 are available in which the validity of a taxing ordinance may be determined. The principal alternative to section 6 is

11. See note 2 supra.

an action for a refund.[12] The General Assembly has authorized such suits by those who have paid "any taxes of any sort . . . to which [a] political subdivision is not legally entitled" except where "the taxpayer involved had or has available . . . a specific remedy by way of review, appeal, refund or otherwise, for the recovery of moneys paid as aforesaid." [13] Failure to take an appeal under section 6 would not bar an action for refund. *Pickar v. Owen J. Roberts School District*, 4 Pa.Cmwlth. 273, 276–78, 286 A.2d 14, 16–17 (1972) (alternate holding).[14] Another avenue for challenging the validity of a

**12.** "Whenever any person or corporation of this Commonwealth has paid . . . or hereafter pays . . . into the treasury of any political subdivision . . . any taxes of any sort . . . to which the political subdivision is not legally entitled; then, in such cases, the proper authorities of the political subdivision, upon the filing with them of a written and verified claim for the refund of the payment, are hereby directed to make, out of budget appropriations of public funds, refund of such taxes . . . .

"The right to a refund afforded by this act may not be resorted to in any case in which the taxpayer involved had or has available under any other statute, ordinance or resolution, a specific remedy by way of review, appeal, refund or otherwise, for recovery of moneys paid as aforesaid, unless the claim for refund is for the recovery of moneys paid under a provision of a statute, ordinance or resolution subsequently held, by final judgment of a court of competent jurisdiction, to be unconstitutional, or under any interpretation of such provision subsequently held by such court, to be erroneous."

Act of May 21, 1943, P.L. 349, § 1, as amended by Act of June 21, 1957, P.L. 381, § 2, 72 P.S. § 5566b (1968).

**13.** Id.

**14.** *Pickar* relied upon the fact that an appeal under section 6 requires joinder of "taxpayers representing twenty-five percent or more of the total valuation of real estate in the political subdivision . . . or taxpayers of the political subdivision not less than twenty-five in number aggrieved by the ordinance." Thus no single taxpayer would be entitled to proceed under section 6 (unless he owned twenty-five percent or more of the taxable value of real estate in the political subdivision). Consequently, no waiver could be imputed from failure to do so. See *Alco Parking Corp. v. City of Pittsburgh*, 453 Pa. 245, 253 n. 3, 307 A. 2d 851, 856 n. 3 (1973) (plurality opinion, dictum), rev'd on other grounds, 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974).

An additional reason for the conclusion reached in *Pickar* is that section 6 does not afford a "specific remedy . . . for

taxing ordinance which is available in some circumstances is an action in equity. See *Borough of Greentree v. Board of Property Assessments, Appeals & Review*, 459 Pa. 268, 328 A.2d 819 (1974) (opinion announcing the judgment); id. at 283–286, 328 A.2d at 826–28 (concurring opinion) ; and the cases there collected.

Because there are other procedures by which the validity of a taxing ordinance may be challenged, it would be counter-productive to dismiss proceedings under section 6 solely on the basis of curable defects. We therefore conclude that section 6 does not preclude amendment of a petition after expiration of the thirty days allowed for the commencement of an appeal.[15]

 The City also urges that, even if section 6 did not preclude amendment of the petition, the trial court did not err in refusing to allow amendment. In support of its argument it quotes *Kilian v. Allegheny County Distributors*, 409 Pa. 344, 347, 185 A.2d 517, 519 (1962):

"The amendment of pleadings is a matter for the exercise of a wise and judicial discretion in the court below. The right to amend should be liberally granted at any stage of the proceedings, unless there is

the recovery of moneys." By its terms, section 6 limits the remedy available under that section to declaratory relief. See note 2 supra ("It shall be the duty of the court to declare the ordinance . . . valid unless . . . . The court may declare invalid all or any portion of the ordinance.").

15. The City also cites *Hyam v. Upper Montgomery Jt. Auth.*, 399 Pa. 446, 160 A.2d 539 (1960), and *Robinson v. Philadelphia*, 400 Pa. 80, 161 A.2d 1 (1960), for the proposition that

"[T]his Court has often held in other situations that when complaints addressed to the conduct of public officials fail to set forth specific facts which, if proved, would establish a cause of action, then complaints will be dismissed with prejudice and without leave to amend." Brief for Appellant at 30. Neither of the cases cited discusses the question of amendment, suggesting that the matter was not raised in those cases. Surely neither stands for the proposition urged by the City nor are we aware of any other authority which supports that proposition. We see no reason for its adoption in this case.

190

. . . *resulting prejudice to an adverse party.*" (footnote omitted; emphasis in original)

It is the contention of the City that it would be prejudiced by a grant of leave to amend. However, the "prejudice" it asserts is of the same type it urged in support of a rule precluding any amendment of the petition after the expiration of the period allowed for filing it—that is, "delay" in the tax and uncertainty in its financial affairs. We find these arguments no more persuasive in the present context than we did before.

 Finally, it is urged that the decision of the trial court on leave to amend, being an exercise of its discretion, may not be reversed in the absence of plain error. See *Schaffer v. Larzelere,* 410 Pa. 402, 406–07, 189 A.2d 267, 270 (1963); *Trabue v. Walsh,* 318 Pa. 391, 177 A. 815 (1935). That rule has no application in this case.

The trial court's denial of leave to amend was not based upon an ordinary exercise of its discretion. It considered at some length whether the fact that individual plaintiffs were subject to the tax imposed by this ordinance would suffice to render them "aggrieved by the ordinance." It concluded that this fact would not be sufficient and therefore refused to allow an amendment to allege that fact because such an amendment would be futile. There is no basis in the record for the belief that leave to amend would have been denied had the trial court concluded that the amendment would have overcome the defect in the petition resulting from failure to allege any manner in which the individual plaintiffs were "aggrieved by the ordinance." Thus, if the trial court erred in its initial premise, the denial of leave to amend cannot stand.

## II

We now turn to the question of whether the plaintiffs in this case are "aggrieved by the ordinance." [16] We shall first discuss the general principles applicable to this inquiry. Then, because the standing of the individual plaintiffs is crucial to the maintenance of this proceeding,[17] we will consider whether they are "aggrieved by the ordinance." Finally, we will consider the standing of the parking operators.

## A

The established formulation of what is necessary to render a person "aggrieved" by an order or other action, which originated in *Lansdowne Board of Adjustment's Appeal*, 313 Pa. 523, 525, 170 A. 867, 868 (1934), appeared most recently in *Man O' War Racing Association, Inc. v. State Horse Racing Commission*, 433 Pa. 432, 441, 250 A.2d 172, 176–77 (1969) :

> " '[The party] must have a direct interest in the subject-matter of the particular litigation, otherwise he can have no standing to appeal. And not only must the party desiring to appeal have a direct interest in the particular question litigated, but his interest must be immediate and pecuniary and not a remote consequence of the judgment. The interest must also be substantial.' *Keystone Raceway Corp. v. State Harness Racing Commission*, 405 Pa. 1, 7–8, 173 A.2d 97, 100 (1961)."

It appears that certain aspects of this formulation have resulted in confusion among the lower courts, including

16. From this point onward, we shall treat the petition as if it alleged that the individual plaintiffs are subject to the tax imposed by the ordinance.

17. As noted in part I, dismissal of the individual plaintiffs would cause the petition to fail for want of the number of plaintiffs required to maintain an appeal under section 6.

the trial court in this case. Consequently, we must attempt to clarify the relevant principles in this opinion.

The core concept, of course, is that a person who is not adversely affected in any way by the matter he seeks to challenge is not "aggrieved" thereby and has no standing to obtain a judicial resolution of his challenge.[18] In particular, it is not sufficient for the person claiming to be "aggrieved" to assert the common interest of all citizens in procuring obedience to the law.[19]

18. *Pierro v. Pierro,* 434 Pa. 131, 252 A.2d 652 (1969); *Commonwealth v. Smith,* 409 Pa. 521, 187 A.2d 267 (1963); *Atlee Estate,* 406 Pa. 528, 178 A.2d 722 (1962); *Dwyer v. Dilworth,* 392 Pa. 123, 139 A.2d 653 (1958); *Lansdowne Board of Adjustment's Appeal,* 313 Pa. 523, 170 A. 867 (1934); *Carother's Estate,* 300 Pa. 185, 150 A. 585 (1930); *Knowles's Estate,* 295 Pa. 571, 145 A. 797 (1929); *Commonwealth v. Haldeman,* 288 Pa. 81, 135 A. 651 (1927); *Gentile v. Philadelphia & R. Ry.,* 274 Pa. 335, 118 A. 223 (1922); *Estate of Graff, Bennett & Co.,* 146 Pa. 415, 23 A. 397 (1892); *Gallagher's Appeal,* 89 Pa. 29 (1879); *Bruhin v. Kassab,* 12 Pa.Cmwlth. 455, 317 A.2d 58 (1974).

19. *Pennsylvania SPCA v. Bravo Enterprises, Inc.,* 428 Pa. 350, 361–62, 237 A.2d 342, 349 (1968); *State Bd. of Undertakers v. Joseph Sekula Funeral Homes, Inc.,* 339 Pa. 309, 14 A.2d 308 (1940); *Smith v. McCarthy,* 56 Pa. 359 (1867); *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists Comm. to Stop The War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); but see Jaffe, The Citizen as Litigant in Public Actions: The Non-Hohfeldian or Ideological Plaintiff, 116 U.Pa.L.Rev. 1033 (1968); cf. *League of Women Voters v. Lower Merion Twp. Bd. of Comm'rs.,* 451 Pa. 26, 301 A.2d 797 (1973); *Faden v. Philadelphia Housing Auth.,* 424 Pa. 273, 278–79, 227 A.2d 619, 621–22 (1967).

*State Bd. of Undertakers v. Joseph Sekula Funeral Homes, Inc.,* supra, is instructive on a related point. In that case the board had revoked the license of a corporation to engage in undertaking. On appeal, the Court of Common Pleas of Dauphin County reversed, holding that the statutory provision relied upon by the board had been repealed. The Funeral Directors Association of Philadelphia then intervened and obtained a rehearing in the court of common pleas, which, however, adhered to its initial decision. This Court held that the association and its members had no standing to appeal from the order of the court of common pleas. So far as can be told from the opinion the corporation in question did not operate in Philadelphia, so that the members of the association would suffer no competitive injury from its continuance in business. However, the determination that a rule

It is the latter principle which lies behind the traditional formulation's requirement that the would-be "aggrieved" party must have an interest which is "pecuniary" and "substantial." Thus, for example, it is clear that some interests will suffice to confer standing even though they are neither pecuniary nor readily translatable into pecuniary terms. E. g., *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 683–87, 93 S.Ct. 2405, 2414–16, 37 L.Ed.2d 254 (1973) (adverse effect upon plaintiffs' use of "the forests, streams, mountains, and other resources in the Washington metropolitan area for camping, hiking, fishing, and sightseeing and other recreational [and] aesthetic purposes") ;[20] *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (dilution of the value of a vote); *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (necessity of taking affirmative

which formerly restricted the class of potential competitors had been repealed probably would result in increased competition. Nevertheless, it was unnecessary for the Court to consider whether this probability of increased competition gave the association standing. This was so because the crucial question is whether the person claiming to be "aggrieved" is harmed by the *action* which he challenges. The legal grounds on which that action is based are generally irrelevant to this question.

20. "[In *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L. Ed.2d 636 (1972),] we made it clear that standing was not confined to those who could show 'economic harm' . . . . Nor, we said, could the fact that many persons shared the same injury be sufficient reason to disqualify from seeking review of an agency's action any person who had in fact suffered injury. Rather, we explained: 'Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process.' Id., at 734, 92 S.Ct., at 1366. Consequently, neither the fact that the appellees here claimed only a harm to their use and enjoyment of the natural resources of the Washington area, nor the fact that all those who use those resources suffered the same harm, deprives them of standing."
412 U.S. at 686–87, 93 S.Ct. at 2415. Accord, *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153–54, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) (dictum).

steps to be excused from religious exercise on school premises) ; *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (interest in being free of invidious racial discrimination in public schooling) ; *Frame v. Sutherland,* 459 Pa. 177, 327 A.2d 623 (1974) (by implication) (interest of senator in confirming or rejecting gubernatorial appointments) ; *Asarewicz Liquor License Case,* 163 Pa.Super. 459, 62 A.2d 78 (1948) (interest of church in not having nearby premises utilized for sale of liquor); see generally Stewart, The Reformation of American Administrative Law, 88 Harv.L. Rev. 1667, 1737–38 (1975) ; but see *Cablevision v. Zoning Hearing Board,* 13 Pa.Cmwlth. 232, 320 A.2d 388 (1974) (abutting landowner's aesthetic interest in preventing erection of "unsightly" tower which "affects the enjoyment of her property" not sufficient to confer standing).

Similarly, even when the interest is "pecuniary" there is no minimum threshold on its magnitude.[21]

**21.** Two classes of cases which support this proposition deserve special comment. First, a taxpayer is permitted to sue in order to prevent waste or illegal expenditure of public funds. E. g., *Dombrowski v. Philadelphia,* 431 Pa. 199, 245 A.2d 238 (1968); *Faden v. Philadelphia Housing Auth.,* 424 Pa. 273, 227 A.2d 619 (1967); *Price v. Philadelphia Parking Auth.,* 422 Pa. 317, 221 A.2d 138 (1966). For this purpose, it matters not how trifling the amount of taxes paid by the plaintiff (which obviously sets a maximum to his pecuniary interests). Second, a duly licensed member of a profession has standing to seek an injunction against unauthorized practice of that profession by another. *Boggs v. Werner,* 372 Pa. 312, 94 A.2d 50 (1953) (dentistry); *Palmer v. O'Hara,* 359 Pa. 213, 58 A.2d 574 (1948) (medicine); *Neill v. Gimbel Brothers, Inc.,* 330 Pa. 213, 199 A. 178 (1938) (by implication) (optometry); *Shortz v. Farrell,* 327 Pa. 81, 193 A. 20 (1937) (by implication) (law); *Childs v. Smeltzer,* 315 Pa. 9, 171 A. 883 (1934) (by implication, dictum) (law). As we noted in *Pennsylvania SPCA v. Bravo Enterprises, Inc.,* 428 Pa. 350, 359 n. 6, 237 A.2d 342, 347–48 n. 6 (1968), "The rationale allowing the injunction no doubt proceeds on the ground that the lawful practitioner's property rights are being impinged upon." However, because the plaintiff need not even practice in the same community as the unlawful practitioner, the injury to the plaintiff's property rights may be so small as to be almost undetectable.

*Harper v. Virginia Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (poll tax of $1.50); *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (fine of $5 and costs); *City of Pittsburgh Milk Marketing Board Appeals*, 7 Pa.Cmwlth. 180, 191, 299 A.2d 197, 202 (1973) (milk consumers are "aggrieved" by increase in minimum price of milk amounting to "pennies per quart"); K. Davis, Administrative Law Treatise § 22.09–5 (Supp.1970); but see *Scientific Living, Inc. v. Hohensee*, 440 Pa. 280, 292–93, 270 A.2d 216, 222–23 (1970) (semble); Stewart, The Reformation of American Administrative Law, supra, at 1735–36 (suggesting limitations based in part on the "significance" of the interest).

Thus, the requirement of a "substantial" interest simply means that the individual's interest must have substance—there must be some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law. The requirement that the interest be "pecuniary," which may once have had independent significance, no longer adds anything to the requirement of an interest having substance, as defined above.

The requirement that an interest be "direct" simply means that the person claiming to be aggrieved must show causation of the harm to his interest by the matter of which he complains.[22] This point is illustrated by two cases decided by the United States Supreme Court, *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct.

22. This is the basis of *Devereux Estate*, 353 Pa. 560, 46 A.2d 168 (1946). There the trustee had sought to resign and suggested a successor trustee who was willing to serve. The trial court refused to accept the trustee's resignation and the proposed successor sought to appeal. This Court quashed the appeal for want of standing. Even had the trial court accepted the resignation of the trustee, there was no basis for believing that it would have appointed the proposed successor as its replacement.

2197, 45 L.Ed.2d 343 (1975), and *Linda R. S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

*Warth* was a challenge to the allegedly exclusionary zoning ordinance of the town of Penfield. Among the plaintiffs were low-income individuals who wished to reside in Penfield but had been unable to locate housing they could afford. The Supreme Court affirmed the dismissal of the complaint for want of standing, explaining:

> "In their complaint, petitioners . . . alleged in conclusory terms that they are among the persons excluded by respondents' actions. None of them has ever resided in Penfield; each claims at least implicitly that he desires, or has desired, to do so. Each asserts, moreover, that he made some effort, at some time, to locate housing in Penfield that was at once within his means and adequate for his family's needs. Each claims that his efforts proved fruitless. We may assume, as petitioners allege, that respondents' actions have contributed, perhaps substantially, to the cost of housing in Penfield. *But there remains the question whether petitioners' inability to locate suitable housing in Penfield reasonably can be said to have resulted, in any concretely demonstrable way, from respondents' alleged constitutional and statutory infractions. Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in Penfield and that, if the court affords the relief requested, the asserted inability of petitioners will be removed.*

> "We find the record devoid of the necessary allegations."

422 U.S. at 503–04, 95 S.Ct. at 2207–08 (emphasis supplied, footnotes and citation omitted).

Similarly, in *Linda R. S. v. Richard D.,* supra, the mother of an illegitimate child was held not to have

standing to challenge the failure of the State of Texas to provide criminal penalties for failure to support an illegitimate child similar to the criminal sanctions imposed for failure to support a legitimate child. The Court conceded that the plaintiff's inability to obtain support payments from the father of the child constituted an injury to her. However, it reasoned that she had failed to show a causal connection between this injury and the statutory distinction complained of. Because any action under the criminal statute would be dependent on the discretion of the prosecutor, there was no basis in the record for the conclusion that a decision holding the classification invalid would assist the plaintiff in obtaining support payments.

The remaining requirements of the traditional formulation of the standing test are that the interest be "immediate" and "not a remote consequence of the judgment." As in the case of "substantial" and "pecuniary," these two requirements reflect a single concern. Here that concern is with the nature of the causal connection between the action complained of and the injury to the person challenging it.

Generalization about the degree of causal connection required to confer standing is more difficult than generalization about the other requirements discussed above. However, it is clear that the possibility that an interest will suffice to confer standing grows less as the causal connection grows more remote. Compare *Man O' War Racing Association v. State Horse Racing Commission*, 433 Pa. 432, 250 A.2d 172 (1969) (applicant for one of four available licenses to conduct horse racing accompanied by parimutuel betting is "aggrieved" by order awarding all four licenses to others thereby foreclosing any possibility that it could receive a license), with *Keystone Raceway Corp. v. State Harness Racing Commission*, 405 Pa. 1, 173 A.2d 97 (1961) (applicant

for one of four available licenses to conduct harness racing accompanied by parimutuel betting is not "aggrieved" by an order awarding one of the licenses to another where its application is still under consideration for the other three available licenses). It is also clear that standing will be found more readily where protection of the type of interest asserted is among the policies underlying the legal rule relied upon by the person claiming to be "aggrieved." [23] Compare *Ritter Finance Co. v. Myers,* 401 Pa. 467, 165 A.2d 246 (1960) (small loan company is not "aggrieved" by the grant of a license to a competing small loan company because regulatory scheme governing small loan companies is not concerned with the level of competition among such companies),

**23.** See *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (tenant farmers receiving benefits under federal statute have standing to challenge regulations increasing their freedom to assign the benefits in advance on the ground that their increased freedom to assign renders them more vulnerable to exploitation by their landlords because protection of tenant farmers from such exploitation is within the zone of interests protected by the statute); *Association of Data Processing Service Organizations, Inc., v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (plaintiffs in the business of providing data processing services have standing to challenge administrative ruling permitting national banks to furnish such services to their customers because the "zone of interests" protected by the regulatory scheme arguably includes the interest of non-bank competitors not being subjected to competition from banks in the provision of non-banking services); *Arnold Tours v. Camp,* 400 U.S. 45, 91 S. Ct. 158, 27 L.Ed.2d 179 (1970) (travel agents have standing to challenge ruling permitting banks to furnish travel services for same reason); *Investment Company Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (investment companies have standing to challenge ruling permitting banks to operate investment funds for same reason).

The test applied in these cases accords standing where the plaintiff has suffered (or will suffer) "injury in fact" and the interest he seeks to protect is "arguably within the zone of interests sought to be protected or regulated by the statute or constitutional guarantee in question." See generally K. Davis, Administrative Law Treatise § 22.00–1 to –5 (Supp.1970); Stewart, The Reformation of American Administrative Law, 88 Harv.L.Rev. 1667, 1730–42 (1975); Albert, Standing to Challenge Administrative Action: An Inadequate Surrogate for Claims for Relief, 83 Yale L.J. 425, 493–97 (1974).

with *Delaware County National Bank v. Campbell*, 378 Pa. 311, 106 A.2d 416 (1954) (national bank is "aggrieved" by approval of a merger between state banks which will enhance competitive potential of local competitor because regulatory scheme governing banks is designed to protect creditors and stockholders of banks from bank failure caused by excessive competition);[24] compare *Seitz Liquor License Case*, 157 Pa.Super. 553, 43 A.2d 547 (1945) (homeowner has no standing to challenge issuance of liquor license for property in same neighborhood because his interest was only a "collateral concern" for the "indirect effect" which issuance of the license might have on the value of his property), with *Gismondi Liquor License Case*, 199 Pa.Super. 619, 186 A.2d 448 (1962) (because statute now directs Liquor Control Board to consider effect on "welfare, health, peace and morals of the inhabitants of the neighborhood . . . of the place proposed to be licensed" homeowners in the neighborhood do have standing to challenge issuance of a liquor license to protect themselves from the "immediate and actual consequences" of the board's action).

Beyond the two guidelines just discussed, there are no simple rules for determining precisely how close a causal connection between the conduct complained of and the injury to the challenger is necessary to confer standing. Because this is the core of the issue presented as to the standing of the parking operators in this case, further discussion of the point will be deferred until that portion of the opinion.

One final point should be noted before turning to the application of these principles to the facts of this case. Some of our cases speak in terms of requiring the inter-

24. *Delaware County Nat'l Bank* was followed in *Franklin Fed. Sav. & Loan Ass'n v. Patterson*, 421 Pa. 409, 218 A.2d 724 (1966) (federal savings & loan association is aggrieved" by authorization for state savings & loan association to open branch in location competitive with federal savings & loan association).

est invaded by the challenged conduct to be a "legal right" before standing may be conferred on the plaintiff. E. g., *Louden Hill Farm, Inc., v. Milk Control Commission*, 420 Pa. 548, 551–52, 217 A.2d 735, 737 (1966). To some extent, the language is a remnant of an older approach which took the position that an individual had no standing to challenge governmental action unless he alleged injury of a sort which would give rise to a cause of action against another individual.[25]

See generally K. Davis, Administrative Law Treatise § 22.04 (1958); Albert, Standing to Challenge Administrative Action, 83 Yale L.J. 425, 432–38 (1974); Stewart, The Reformation of American Administrative Law, 88 Harv.L.Rev. 1667, 1723–25 (1975). However, this test proved to be unsatisfactory,[26] and has now been generally discarded.[27] See, e. g., *Allegheny Contracting Industries, Inc., v. Flaherty*, 6 Pa.Cmwlth. 164, 293 A.2d 639 (1972) (bidder on city contract has standing to compel mayor to open and consider its bid).

Aside from this now-outmoded use of the "legal right" requirement for standing, the term is also used, frequently in a conclusory fashion, in what are essentially deci-

**25.** Illustrative of this approach is *Easton Transit Company's Petition*, 270 Pa. 136, 112 A. 917 (1921), where regular passengers on a transit line were held to have no standing to appeal from an order granting the petition of the transit company to discontinue service on the line. The case is treated as a simple contract case (with the company's franchise as the contract). Since the passengers are not parties to the "contract," they have no right to "meddle" in its administration. Similarly, cessation of a private business gives rise to no liabilities to its former customers in the absence of individual contracts, so the passengers simply have no "legal right." Whether the passengers might have some rights under the regulatory scheme involved is only cursorily considered.

**26.** Some of the reasons why this rule proved unsatisfactory are discussed in Albert, Standing to Challenge Administrative Action: An Inadequate Surrogate for Claims for Relief, 83 Yale L.J. 425, 434, 443–44 (1974).

**27.** The United States Supreme Court formally abandoned that doctrine in *Association of Data Processing Service Organizations, Inc., v. Camp*, 397 U.S. 150, 153–54, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

sions on the merits of the claim asserted. In these cases, a finding that a party has no standing simply means that the interest he asserts is not protected by the legal provisions he relies upon. E. g., *Louden Hill Farm, Inc., v. Milk Control Commission*, 420 Pa. 548, 217 A.2d 735 (1966) ; [28] *Beauty Hall v. State Board of Cosmetology*, 418 Pa. 225, 210 A.2d 495 (1965) ; [29] *Elliot Estate*, 388 Pa. 321, 131 A.2d 357 (1957). [30] Consequently, they

**28.** Appellant in this case sold milk in a retail store. It initiated a proceeding before the Milk Control Commission seeking a reduction in the minimum price of milk sold in stores. The Commission granted a reduction, but not as large a reduction as sought by appellant. On appeal from the Commission's order, this Court, by a sharply divided vote, held that appellant's only "legal right" under the Milk Control Act was to a "reasonable return." Because appellant did not contend that the price set would prevent it from earning a "reasonable return," the Court held that appellant had no standing to appeal from the order. The dissenters believed that appellant's interest in charging a price lower than that permitted by the Commission's order sufficed to give appellant standing to appeal. The dispute thus turned solely upon construction of the Milk Control Act.

**29.** The plaintiff in this case was a school offering training to aspiring beauticians, who were thereby enabled to satisfy the educational requirements for a state license. In 1959 the General Assembly added to the qualifications for licensing previously in force a requirement that the applicant have completed a tenth grade education or its equivalent. Plaintiff contended that this increased standard for licensing beauticians deprived it of property without due process of law because it removed persons without a tenth grade education from the potential clientele of the school, thereby making the business less valuable. This Court held that plaintiff lacked standing to challenge the legislation. Among the reasons offered for this conclusion was that appellant had no property interest in the statutory requirement that beauticians complete education of the sort offered by the plaintiff. Consequently, the addition of a further educational requirement did not impair any property interest of appellant even if it did result in a reduction in the number of students who would enroll in the school to satisfy the licensing requirements. Thus, in the absence of any "property right" of appellant, there was no taking of property without due process of law.

**30.** The principle involved in this case is that a trustee may not assert against his cestuis his interest in continuation of a trust in order to continue his employment as trustee. The basis for this conclusion is not that he suffers no injury from the termination of the trust, for the loss of future trustee's fees clearly constitutes an injury. (Compare *Estate of Graff, Bennett & Co.*, 146

must be understood simply as adjudications as to what interests are protected by particular legal rules and not as expressing general principles of standing.

■ In summary, then, one who seeks to challenge governmental action must show a direct and substantial interest, in the sense discussed above. In addition, he must show a sufficiently close causal connection between the challenged action and the asserted injury to qualify the interest as "immediate" rather than "remote." The requirement of a "legal interest" tends to conceal the necessary construction of the legal rules relied upon by the challenger and therefore is not a useful guide to the determination of standing questions. We now turn to the specific problems presented in this case.

## B

■ The challenged ordinance requires the individual plaintiffs to pay a tax. There can be no doubt that their interest is direct, substantial and immediate. The trial court nevertheless concluded that they had no standing because:

"their interest is no different than that of the general public as to the impact of the tax. They have no special interest separate and apart from the public, and no one has a right not to be taxed. Except for having to pay the tax, no vested interest or right is invaded

Pa. 415, 23 A. 397 (1892); and *Gallagher's Appeal*, 89 Pa. 29 (1879), where the fiduciary sought to challenge only the distribution among those interested in the fund and, therefore, had no interest of his own.) Rather, the conclusion rests on the principle that the trustee's fiduciary duty forbids him to assert this interest against his cestuis. Thus, in the absence of special circumstances, such as the existence of unascertained or incompetent beneficiaries whose interests must be protected, a trustee has no right to appeal from termination of the trust by agreement of the cestuis. This principle is also the basis of *Musser's Estate*, 341 Pa. 1, 17 A.2d 411 (1941).

by the ordinance as to injuriously affect them or impose a burden upon them apart from the general public."

This exhibits a fundamental misunderstanding of the law. The doctrine erroneously relied upon by the trial court is that a public duty

" 'can be enforced only at the suit of [a public official] *or by a private citizen who has a specific and independent legal right or interest in himself different from that of the public at large* or who has suffered an injury special and peculiar to himself.' "

*Dombrowski v. Philadelphia*, 431 Pa. 199, 207, 245 A.2d 238, 243 (1968), quoting *Dorris v. Lloyd (No. 1)*, 375 Pa. 474, 477, 100 A.2d 924, 926 (1953), cert. denied, 347 U.S. 936, 74 S.Ct. 632, 98 L.Ed. 1086 (1954) (emphasis supplied in *Dombrowski*).

This doctrine does not deny relief to one injured by breach of a public duty simply because many others have suffered a similar injury resulting from that breach. See, e. g., *Faden v. Philadelphia Housing Authority,* 424 Pa. 273, 227 A.2d 619 (1967) (taxpayer's suit) ; *Price v. Philadelphia Parking Authority,* 422 Pa. 317, 221 A.2d 138 (1966) (same) ; *Lank v. Hughes,* 402 Pa. 284, 167 A.2d 268 (1961) (mandamus by abutting landowners to compel municipality to repair and maintain street) ; *City of Pittsburgh Milk Marketing Board Appeals,* 7 Pa. Cmwlth. 180, 299 A.2d 197 (1973) (consumers injured by increased price of milk). Rather, the concern is to distinguish those who have suffered some individual injury from those asserting only the common right of the entire public that the law be obeyed.[31]

The error in the trial court's application of the doctrine was refuted by the Supreme Court in *United States v. Students Challenging Regulatory Agency Procedures,*

31. See note 19–21 supra and accompanying text.

412 U.S. 669, 687–88, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973):

"Unlike the specific and geographically limited federal action of which the petitioner complained in *Sierra Club,* the challenged agency action in this case is applicable to substantially all of the Nation's railroads, and thus allegedly has an adverse environmental impact on all the natural resources of the country. Rather than a limited group of persons who used a picturesque valley in California, *all persons who utilize the scenic resources of the country, and indeed all who breathe its air, could claim harm similar to that alleged by the environmental groups here.* But we have already made it clear that standing is not to be denied simply because many people suffer the same injury. Indeed some of the cases on which we relied in *Sierra Club* demonstrated the patent fact that persons across the Nation could be adversely affected by major governmental actions. See, e. g., *Environmental Defense Fund v. Hardin,* 138 U.S.App.D.C. 391, 428 F.2d 1093, 1097 (interests of consumers affected by decision of Secretary of Agriculture refusing to suspend registration of certain pesticides containing DDT); *Reade v. Ewing,* 2 Cir., 205 F.2d 630, 631–632 (interests of consumers of oleomargarine in fair labeling of product regulated by Federal Security Administration). *To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody.* We cannot accept that conclusion." (emphasis added).

Clearly the individual plaintiffs assert individual interests—in not being compelled to expend money—beyond the interest of all citizens in compliance with the law. While it is true that "no one has a right not to be taxed," everyone has an individual right not to be com-

pelled to pay an illegal tax.[32] Moreover, the central purpose of the General Assembly in enacting section 6 was to provide a means whereby those who would be subject to a tax levied under the authority of the Act could obtain a determination of the legality of the tax. Thus, even aside from the ordinary right to be free of illegal exactions, taxpayers have a right to such a determination conferred by section 6.

## C

We now turn to the question of whether the parking operators have standing to challenge the imposition of this tax upon their patrons. The complaint initially alleges that they are taxpayers of the City. It continues with the following allegations concerning the injury to them.[33]

"In the event that the tax imposed by Ordinance No. 30 of 1973 is passed on to patrons of the parking operators within the City of Pittsburgh, said parking operators believe and therefore aver that they will suffer substantial losses of net income due to a reduced patronage of their facilities.

"In the event that the tax imposed by said Ordinance is not passed on to patrons of the various parking facilities within the City of Pittsburgh, the parking operators will suffer a substantial loss to their net income."

The City's preliminary objections admit these allegations for the purpose of testing the complaint. *Ross v. Shaw-*

32. When determining whether plaintiffs have standing to challenge the legality of an action, it must be assumed that the action is in fact contrary to some rule of law. The standing inquiry focuses on the question of whether the plaintiff is a proper person to challenge the alleged illegality. Put another way, assuming that the action is indeed illegal in the fashion claimed by the plaintiff, would he be entitled to any relief.

33. Certain allegations phrased in terms of injury merely assert various grounds on which the ordinance is said to be invalid. These allegations are not material to our present inquiry.

*mut Development Corp.*, 460 Pa. 328, 331 n.2, 333 A.2d 751, 752 n.2 (1975); *Balsbaugh v. Rowland*, 447 Pa. 423, 426, 290 A.2d 85, 87 (1972).

The City argues that only a person actually liable for or required to pay the tax is a "taxpayer . . . aggrieved by the ordinance" entitled to proceed under section 6. In support of this proposition, it offers only *Pocono International Raceway v. Township of Tunkhannock*, 59 Pa.D. & C.2d 221 (C.P. Montgomery 1973), and *Archbold v. Codorus Township School District*, 33 Pa.D. & C.2d 311 (Q.S. York 1963).[34] In each of these cases the language relied upon by the City is, at most, dictum with respect to the problem before us.

In *Archbold* the plaintiffs were liable for the tax, but their standing under section 6 was questioned on the ground that they had not yet paid that tax or any other to the school district. The court responded that

"We believe a reasonable interpretation of the term 'aggrieved taxpayer' is one who is liable for, or required to pay, the tax, regardless of whether he actually has made any such payment."

33 Pa.D. & C.2d at 314. Given its context, it is highly doubtful that this statement can be taken as even intimating any view on the standing of one who is not liable for the tax.

34. The City also cites *Plymouth Lanes, Inc. v. Plymouth Twp.*, 415 Pa. 206, 202 A.2d 811 (1964); *Clearview Bowling Center, Inc. v. Hanover Boro.*, 430 Pa. 579, 244 A.2d 20 (1968); and *Swatara Twp. v. Red Crown Bowling Center, Inc.*, 419 Pa. 482, 214 A.2d 725 (1965), for the proposition that "this Court has consistently rejected attacks on taxes by the proprietor of a bowling establishment, where, as here, the stated burden of the tax is on the customer." These cases are entirely irrelevant to the issue before us.

Those cases involved challenges based on a statutory prohibition against levying "a tax on the privilege of employing such tangible property as is . . . subject to a State tax." We examined the incidence of the tax solely for the purpose of determining whether it was "a tax on the privilege of employing . . . tangible property." Concluding that it was not, we rejected the attack on the merits. No question of standing was even considered.

In *Pocono International Raceway*, the court did construe section 6 as limiting standing to

"two classes of people: (a) Those owning land assessed for taxable purpose equal to at least 25 percent of the total assessed valuation, and (b) Twenty-five taxpayers of the group upon whom the tax is assessed."

59 Pa.D. & C.2d at 223. However, the principal concern of the court was to refute the plaintiff's claim to standing based on the fact that it and its customers accounted for more than 25 percent of the total tax revenues received by the township (largely in the form of admissions taxes). The court correctly rejected this attempt to confuse the two distinct classes of taxpayers entitled to proceed under section 6.[35] Because the lone plaintiff did not allege ownership of land having a valuation for assessment purposes equal to at least 25 percent of the total valuation of property in the township, it clearly could not qualify on either basis. However, the court gratuitously opined that, inasmuch as the plaintiff did not in fact pay the admissions tax, it could never challenge that tax under section 6.

Our analysis of the statute leads us to conclude that any taxpayer may appeal under section 6 if he is "aggrieved by the ordinance" he challenges without regard to whether he is liable for the tax imposed. The statutory language affords the right of appeal to "taxpayers . . . aggrieved by the ordinance." Because the term "aggrieved" is widely used in jurisdictional statutes to refer to any person with an interest sufficient to confer standing, we see no reason to restrict its meaning here to refer only to those liable for the tax imposed by the ordinance.

**35.** "[T]axpayers representing twenty-five percent or more of the total valuation of real estate in the political subdivision as assessed for taxation purposes, *or* taxpayers of the political subdivision not less than twenty-five in number aggrieved by the ordinance . . . shall have the right to appeal . . . ." (emphasis added). See note 2 supra.

The question then is simply whether the parking operators, who allege that they are taxpayers, are "aggrieved by the ordinance." Surely the interest they claim is direct, for a declaration that the ordinance is invalid would obviate either injury alleged. It is also substantial, for they claim pecuniary loss rather than merely relying upon an abstract interest in full compliance with the law. The real question is whether their interest is connected to the ordinance sufficiently closely to be considered immediate rather than remote.

As we have already noted, the primary purpose of section 6 was to allow those who would be liable for the tax imposed to challenge its validity. No legislative purpose can be discerned to either assist or hinder those injured by the imposition of the tax but not subject to it. Consequently, this factor in the "immediacy" analysis is essentially neutral.

We conclude that the causal connection between the tax and the injury to the parking operators is sufficiently close to afford them standing under a statute, such as section 6, which is essentially neutral on the question. While the tax falls initially upon the patrons of the parking operators, it is levied upon the very transaction between them. Thus the effect of the tax upon their business is removed from the cause by only a single short step.

We find very persuasive authority for this conclusion in *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 271, 69 L.Ed. 1070 (1925), and *Truax v. Raich*, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915). In *Pierce*, the operators of private schools were held to have standing to challenge a law which required parents to send their children to public schools. In *Truax*, an alien was held to have standing to challenge a law which forbade certain employers to employ aliens as more than 20% of their work force. In each case the regulation was directed to the conduct of persons other than the plaintiff. However,

the fact that the regulation tended to prohibit or burden transactions between the plaintiff and those subject to the regulation sufficed to afford the plaintiff standing. While the burdens imposed in those cases may have been more onerous than that involved in this case (amounting to a total prohibition in *Pierce*), that does not render the causal connection any less immediate.

The only cases we have discovered which might argue against this result are *Beauty Hall v. State Board of Cosmetology*, 418 Pa. 225, 210 A.2d 495 (1965), and *Northwestern Pennsylvania Automatic Phonograph Association v. Meadville*, 359 Pa. 549, 59 A.2d 907 (1948). We conclude that *Beauty Hall* is distinguishable [36] and *Northwestern Pennsylvania Automatic Phonograph Association* should be overruled.

In *Beauty Hall,* the plaintiff was a school offering training which enabled applicants for licensing as beauticians to satisfy the educational requirements for licensing. It sought to challenge a new statutory requirement that applicants for licensing "have completed a tenth grade education." The injury claimed was a reduction in the number of potential pupils resulting from the disqualification for licensing of those without a tenth grade education. However, this involved no burden upon or regulation of the transactions between the school and such potential pupils. As the Court noted in its opinion, those lacking tenth grade education were still entirely free to enroll in the school if they so desired. What had occurred was only a reduction in a collateral benefit which they might previously have obtained from completition of the course offered by the plaintiff. This is at

**36.** Indeed *Beauty Hall* is doubly distinguishable. A number of grounds were offered for the holding in that case. One of these, as discussed in note 29 supra, amounts to a holding that the plaintiff's claim fails on the merits. Another of the alternate holdings, however, is that the plaintiff's interest is too remote. It is this aspect of the decision which will be distinguished here.

least one step further removed from the injury to the plaintiff than is the tax in this case.[37]

*Northwestern Pennsylvania Automatic Phonograph Association v. Meadville* was an action by an association of owners of "phonograph and music boxes" to enjoin collection of a license tax levied upon persons maintaining coin operated "juke boxes" on their premises. Apparently all members of the association leased their machines to others, on whose premises they were kept. Consequently, none of them were subject to the tax. The Court found their contention that the tax would cause many of their lessees to cease doing business with the plaintiffs insufficient to confer standing. We believe that this case exhibits an insufficient appreciation of the

37. Roughly one-quarter of the City's brief on this issue is devoted to the following parade of horribles:

"Yet the Commonwealth Court does not require that a person "aggrieved" (as required by § 6 of the Local Tax Enabling Act) have an *immediate* interest not a remote consequence, but rather it enunciates a novel test of standing, i. e., could the tax cause the litigant loss of income?

"Perhaps a parking tax might cause loss of income to some of the thousands of retail establishments in the City, or maybe to each of them. Should they have standing to contest the tax? If they raise their prices to cover the loss from the tax, should their customers have standing to contest the tax?

"Similarly if the operator petitioners lose income, perhaps their employees, their attorneys, their accountants, their officers, the wives and children of their officers and a whole host of other people might lose income. Do these people have standing to contest the tax?

"If the operators have standing in this case because of the indirect possibility that their financial interests will be hurt as a result of this tax, then each tenant in the 64-story U. S. Steel Building will have the right to appeal a tax assessment because the tenant may ultimately be responsible for paying the tax. Each cigarette or gasoline purchaser will have the right to contest the excise taxes levied upon wholesalers or retailers, for the customer may ultimately foot the bill." Brief for Appellant at 20–21.

We simply note that none of these hypotheticals involves a tax which is levied on the very transaction between the would-be plaintiff and the taxpayer. Consequently, the interest of each of these "plaintiffs" is at least one step more remote than that of the parking operators in this case. Therefore nothing in our holding today requires that standing be accorded to any of them.

importance of secondary effects. As *Pierce* and *Truax* illustrate, the injury caused by secondary effects of an action may sometimes be as great or greater than that caused by its primary effects. Moreover, *Northwestern Pennsylvania Automatic Phonograph Association* is out of harmony with the modern "trend . . . toward enlargement of the class of people who may protest [governmental] action." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). We therefore conclude that it should be overruled.

Because we conclude that each plaintiff has standing to assert his own interests, we need not consider the question of whether the individual plaintiffs could raise the interests of the parking operators in support of their own positions. See generally K. Davis, Administrative Law Treatise §§ 22.06–.07 (1958 & Supp.1970).

### III

The final contention of the City is that section 6 unconstitutionally delegates to the judiciary the legislative power to fix the rate of a tax.[38] This objection focuses on the following language:

> "It shall be the duty of the court to declare the ordinance and the tax imposed thereby to be valid unless it concludes that the ordinance is unlawful *or finds that the tax imposed is excessive or unreasonable* ; but the court shall not interfere with the reasonable discretion of the legislative body in selecting the subjects or fixing the rates of the tax. The court may declare invalid all or any portion of the ordinance or of the tax imposed *or may reduce the rates of tax.*" (emphasis added).

The City emphasizes that it is not complaining about the traditional power of the judiciary to declare a tax or-

**38.** See Pa.Const., art. II, § 1.

dinance invalid in whole, e. g., *Allentown School District Mercantile Tax Case,* 370 Pa. 161, 87 A.2d 480 (1952), or in part, e. g., *Moon Schools Union School District v. Tiglio,* 183 Pa.Super. 67, 128 A.2d 150 (1956). Its concern is directed solely at the authority to determine whether a tax is "excessive or unreasonable."

We note at the outset that we need not determine whether the power conferred by the statute to "reduce the rates of tax" has any application beyond the type of situation in *Moon Schools Union School District.* In that case, the taxing authority had imposed a tax at a rate in excess of the statutory limits on taxes of that type; the Superior Court, in effect, reduced the tax rate to the maximum permitted by law in the situation before it. Whether the statute confers any broader power to "reduce the rates of tax" and whether such a power could constitutionally be granted are questions which we think it premature to reach in a case where there has been no determination that the rate imposed by the City may not be collected.

 The prohibition against delegation of legislative power " 'requires that the basic policy choices involved in "legislative power" actually be made by the Legislature as constitutionally mandated.' " *Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa. 1, 11, 331 A.2d 198, 202 (1975), quoting *Chartiers Valley Joint Schools v. Allegheny County Board of School Directors,* 418 Pa. 520, 529, 211 A.2d 487, 492 (1965). This doctrine serves two interrelated purposes. First, it seeks to insure that "basic policy choices" be made by duly authorized and politically responsible officials. See generally Stewart, The Reformation of American Administrative Law, 88 Harv.L.Rev. 1667, 1671–81 (1975); Gellhorn & Robinson, Perspectives on Administrative Law, 75 Colum.L.Rev. 771, 773–79 (1975). Second, it seeks to protect against the arbitrary exercise of unnecessary and uncontrolled discretionary power. See *Tosto v. Pennsyl-*

*vania Nursing Home Loan Agency,* supra, 460 Pa. at 12, 331 A.2d at 203–04, and cases there cited; *Pennsylvania State Board of Pharmacy v. Cohen,* 448 Pa. 189, 202 & n. 14, 292 A.2d 277, 284 & n. 14 (1972); *Commonwealth v. Franklin,* 172 Pa.Super. 152, 92 A.2d 272 (1952); K. Davis, Administrative Law Treatise §§ 2.00 to 2.00–6 (Supp.1970).

Insofar as the delegation doctrine is concerned with the latter purpose, assigning the task to the judiciary affords substantial protections. The trial court must explain the grounds of its decision in a reasoned opinion which will serve as a precedent to guide decisions in future cases. Moreover, the decisions of trial courts are subject to careful review by appellate courts to insure the general consistency of their actions with one another and to confine them within their proper sphere. These safeguards provide considerable protection against "the arbitrariness of ad hoc decision making,"[39] and "injustice on account of unnecessary and uncontrolled discretionary power."[40] See *Nester Appeal,* 187 Pa.Super. 313, 320, 144 A.2d 623, 627 (1958); K. Davis, Administrative Law Treatise §§ 2.00–5 & –6 (Supp.1070); Davis, Administrative Law Surprises in the *Ruiz Case,* 75 Colum.L.Rev. 823, 833–35 (1975); but see *Commonwealth v. Franklin,* 172 Pa.Super. 152, 92 A.2d 272 (1952).

By providing standards to guide those to whom administration of a legislative scheme is entrusted, the General Assembly serves both purposes. Such standards both articulate the "basic policy choices" made by the General Assembly and serve to confine the exercise of discretion, thus guarding against its arbitrary exercise. The question tendered by the City is whether the stan-

**39.** *Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa. 1, 14, 331 A.2d 198, 204 (1975).

**40.** K. Davis, Administrative Law Treatise § 2.00–5, at 53 (Supp. 1970) (emphasis omitted).

dards provided to guide a court in proceedings under section 6 are sufficient to serve these purposes.

■■■ Specifically, the City contends that the power to find a tax invalid if it is "excessive and unreasonable" constitutes an unconstitutional delegation of legislative power. We do not agree.

Many standards in the law are no more definite than a requirement of "reasonableness." The most notable example is the law of negligence, where the principal determinant of liability is whether the actor has acted as "a reasonable man" would act in like circumstances. Restatement (Second) of Torts § 283 (1965); W. Prosser, Law of Torts §§ 31-32 (1971). Indeed, the concept of "reasonableness" pervades the common law. See, e. g., *Reid v. Brodsky*, 397 Pa. 463, 469-70, 156 A.2d 334, 338 (1959). That standard has for centuries been found adequate to guide the conduct of private actors and to provide a standard for judging that conduct. This argues strongly against the position of the City.

Furthermore, delegations of authority guided by standards no more precise than that involved here have frequently been upheld by our courts. See *Commonwealth v. Cherney*, 454 Pa. 285, 312 A.2d 38 (1973) (Secretary of Highways authorized to establish speed limits different from those provided by statute "where traffic or other conditions of the highways make it safe to operate motor vehicles" at a speed other than that specified in the statute) ; *DePaul v. Kauffman*, 441 Pa. 386, 272 A.2d 500 (1971) (rent withholding permitted whenever municipal department certifies that dwelling is "unfit for human habitation"); *Chartiers Valley Joint Schools v. Allegheny County Board of School Directors*, 418 Pa. 520, 211 A.2d 487 (1965) (school reorganization permitted only if Council of Basic Education "deems wise in the best interests of the educational system of the Commonwealth"); *Palmer Township Annexation Case*, 416

Pa. 163, 204 A.2d 760 (1964) (court authorized to "review the propriety as well as the legality of the [annexation] ordinance"); *Pennsylvania Water & Power Resources Board v. Green Springs Co.,* 394 Pa. 1, 145 A.2d 178 (1958) (Board authorized to refuse permit to add to any dam which is "unsafe or needs repair . . . or for any reason is derogatory to the regimen of the streams"); *Dauphin Deposit Trust Co. v. Myers,* 388 Pa. 444, 130 A.2d 686 (1957) (dictum) (Department of Banking authorized to approve bank merger where community "is without adequate banking facilities"); *Weaverland Independent School District Case,* 378 Pa. 449, 106 A.2d 812 (1954) (Superintendent of Public Instruction directed to pass upon merits of petition to establish independent school district "from an educational standpoint"); *Belovsky v. Redevelopment Authority,* 357 Pa. 329, 54 A.2d 277 (1947) (Authority empowered to condemn property in area which is "blighted because of the unsafe, unsanitary, inadequate or over-crowded condition of the dwellings therein, or because of inadequate planning of the area, or excessive land coverage by the buildings thereon, or the lack of proper light and air and open space, or because of the defective design and arrangement of the buildings thereon, or faulty street or lot layout, *or economically or socially undesirable land uses*" [emphasis added]); *Fisher's Petition,* 344 Pa. 96, 23 A. 2d 878 (1942) (Secretary of Labor and Industry authorized to set "minimum fair wages" for women and minors "reasonably commensurate with the value of the service or class of service rendered"); *Tate Liquor License Case,* 196 Pa.Super. 193, 173 A.2d 657 (1961) (Liquor Control Board authorized to refuse license to premises if it "would be detrimental to the welfare, health, peace and morals of the inhabitants of [the] neighborhood."); *Nester Appeal,* 187 Pa.Super. 313, 144 A.2d 623 (1958) (court authorized to determine "propriety" of abolishing all wards in a borough "to suit the conven-

ience of the inhabitants thereof"); *Pittsburgh & Allegheny Telephone Co. v. Braddock Borough*, 43 Pa.Super. 456 (1916) (court authorized to determine whether license fees imposed by borough are "reasonable"); see also cases cited in 1 K. Davis, Administrative Law Treatise §§ 2.03–.04. (1958).

■■■ Moreover, the General Assembly has given considerable content to the requirement that a tax not be "excessive or unreasonable." In determining whether adequate standards have been established, we look to the entire Act; "we are not limited to the mere letter of the law, but must look to the underlying purpose of the statute and its reasonable effect." *Commonwealth v. Cherney*, 454 Pa. 285, 290, 312 A.2d 38, 41 (1973) (footnote omitted); *Tosto v. Pennsylvania Nursing Home Loan Agency*, 460 Pa. 1, 331 A.2d 198 (1975); *Chartiers Valley Joint Schools v. Allegheny County Board of School Directors*, 418 Pa. 520, 211 A.2d 487 (1965); *Pennsylvania Water & Power Resources Board v. Green Springs Co.*, 394 Pa. 1, 145 A.2d 178 (1958). Examined in this fashion, the Local Tax Enabling Act affords considerable guidance to a court in deciding a proceeding under section 6.

■■■ First, section 17(a) of the Act, 53 P.S. § 6917(a), establishes a limit on the aggregate amount of all taxes which may be imposed by a political subdivision. This provides the exclusive measure of whether the aggregate tax burden of the subdivision is "excessive or unreasonable" within the meaning of section 6. Similarly, section 8 of the Act limits the rates which may be imposed as to certain types of taxes. As to those types of tax, that section provides the exclusive measure of what constitutes an "excessive or unreasonable" tax within the meaning of section 6.

[■■ The very variety of taxes authorized by the Act precluded specification of limits on all types of tax. The

problem therefore remains how to deal with those taxes which the Act authorizes a political subdivision to impose but which are not specifically limited by section 8. Even in such cases, we believe that section 8 provides a valuable starting point. A tax may be outside of the class governed by section 8 but sufficiently similar to a member of that class to support the conclusion that a rate entirely disproportionate to the rates specified by section 8 for the similar tax would be "excessive and unreasonable." Before reaching such a conclusion, a court would need to consider carefully any differences (e. g., in economic impact of the tax, ability of the class of taxpayers to pay, relation of other taxes imposed on the class of taxpayers to the cost of services rendered to them, etc.) suggested by the taxing authority, giving great weight to the judgment of the municipal officials as to the significance of those differences.[41] Nevertheless, should the court so conclude, section 6 would prohibit the imposition of that tax at that rate.

There may be taxes, possibly including the one involved in this case, as to which the ascertainment of the precise standards to be applied under section 6 will be more difficult. In such cases, the court will find it necessary to seek farther afield for legal rules which can supplement whatever guidance may be extracted from section 8. If, for example, the General Assembly, now or in the past, has levied a tax similar to that in question, this would provide some indication of a rate which is *not* considered "excessive or unreasonable." The examples given in this opinion are not exclusive, for there may be other sources which will cast light upon what constitutes an "excessive or unreasonable" rate of tax. We emphasize, however, that the analytic process is essentially similar to the normal process of analogical

---

**41.** Section 6 specifically directs that "the court shall not interfere with the reasonable discretion of the legislative body in selecting the subjects or fixing the rates of tax."

reasoning basic to the common law. The particular sociopolitical views of the judges who hear the case do *not* provide an adequate standard on which a finding of invalidity may be based.

Much of the City's brief on this issue is directed to arguments on questions not seriously in dispute. Thus, we agree that the power to tax is a legislative power, *Wilson v. Philadelphia School District*, 328 Pa. 225, 228, 195 A. 90 (1973); *Leahey v. Farrell*, 362 Pa. 52, 66 A.2d 577 (1949) (dictum), and that its delegation to the judiciary would be unconstitutional, see *Wilson v. Philadelphia School District*, supra; *Commonwealth v. Franklin*, 172 Pa.Super. 152, 92 A.2d 272 (1952). The difficulty with the City's position is that there is no such delegation here.

The fallacy of the City's argument may readily be seen from consideration of *Wilson v. Philadelphia School District*, supra, the principal case relied upon by the City. There the appointed school board was authorized to levy a tax sufficient to pay the indebtedness of the district, the salaries of the teaching and supervising staff, and all other expenses of the district. As to the general expenses, a maximum limit on the permissible amount was imposed, and a limitation on permissible indebtedness accomplished the same effect with regard to debt service costs. However, the board had the power to increase the teaching and supervising staff without limit, which implied a like power to increase the tax rate. It was held that the delegation to an appointed body of the effective power to impose taxes in an unlimited amount was unconstitutional.

Here, in contrast, the challenged delegation does not involve a grant of the power to tax. All taxes challenged under section 6 must necessarily have been levied by political subdivisions as the tax here was levied by the elected city council. The courts are simply given a pow-

er to prevent such subdivisions from exceeding the scope of their delegated authority by levying "excessive or unreasonable" taxes.

The more relevant case is therefore *Pittsburgh & Allegheny Telephone Co. v. Braddock Borough*, 43 Pa.Super. 456 (1910), a case which is very nearly in point. There the borough challenged a statute which authorized the courts to review municipal license fees to determine whether they were "reasonable." The Superior Court rejected a claim that the statute delegated legislative power to the courts and affirmed a judgment reducing such fees:

> "It is further alleged that by this act the legislature has attempted to delegate legislative power to the courts. A study of the act clearly enough shows, we think, that the court, in entering the decree contemplated by the act, in no sense exercises legislative power. It merely ascertains and defines the boundary line which separates the reasonable from the unreasonable. The legislature, whose creature the appellant is, has declared that in the exercise of the police powers delegated to it, it must keep within that boundary line. With that limitation defined, the municipality, keeping within it, has the exclusive right as before to determine the exact amount of license fees which the corporations mentioned in the act must pay."

43 Pa.Super. at 464.

Neither is there anything contrary to today's holding in *City of Pittsburgh v. Alco Parking*, 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974). The City relies upon the following passage from *Alco Parking*:

> "Nor are we convinced that the ordinance loses its character as a tax and may be stricken down as too burdensome under the Due Process Clause if the taxing authority, directly or through an instrumentality enjoying various forms of tax exemption, competes

with the taxpayer in a manner thought to be unfair by the judiciary. This approach would demand not only that the judiciary undertake to separate those taxes that are too burdensome from those that are not, but also would require judicial oversight of the terms and circumstances under which the Government or its tax-exempt instrumentalities may undertake to compete with the private sector. *The clear teaching of prior cases is that this is not a task that the Due Process Clause of the Federal Constitution demands of or permits to the judiciary.*"

Id. at 376, 94 S.Ct. at 2296 (emphasis added). This passage is inapposite for two reasons.

 First, its teaching is simply that the Due Process Clause does not permit the judiciary to strike down taxes "as too burdensome under the Due Process Clause." Such action necessarily limits the freedom of the General Assembly to discharge its own constitutional responsibilities. Here, in contrast, a court acts not in derogation of the legislative will but in pursuance of that will. Clearly the Supreme Court did not intend to express any view on the validity of statutes such as the one before us, especially not as to questions of state law such as that involved here.

Second, section 6, as we have noted, does not leave a court at large to strike down any tax it considers "too burdensome." Rather it directs the court to consider the entire Act, as well as other expressions of the law of this Commonwealth, to ascertain whether they indicate that the tax imposed is so far divergent from the policies embodied therein as to be "excessive or unreasonable."

The order of the Commonwealth Court vacating the order of the court of common pleas and remanding for amendment of the pleadings and further proceedings thereon is affirmed.

EAGEN, J., filed a concurring opinion in which JONES, C. J., and POMEROY, J., join.

NIX, J., concurs in the result.

EAGEN, Justice (concurring).

I join in the order of the Court remanding the case to the trial court for further proceedings, but I do not join in the opinion of Mr. Justice Roberts.

Section 6 of the Local Tax Enabling Act, Act of December 31, 1965, P.L. 1257, as amended, 53 P.S. § 6906 (1972) gives standing to appeal to "taxpayers . . . *aggrieved* by [an] ordinance" [Emphasis supplied] which is passed pursuant to the act. And for at least four decades this Court has consistently ruled that a person "aggrieved" by an order or other action of an administrative agency is one who has a direct, substantial, immediate and pecuniary interest in the action taken by the administrative body. Mr. Justice Roberts would now eliminate the "pecuniary" interest requirement. I do not subscribe to such a ruling in the instant case.

(1) The elimination of the requirement in this case is inappropriate because both classes of plaintiffs, the parking taxpayers and the lot owners, assert a pecuniary interest. The Commonwealth Court noted that both had a pecuniary interest. Given the long line of precedent in Pennsylvania which requires the interest to be pecuniary, I see no reason to overrule that precedent with what is arguably *dictum*.

(2) Accepting that the elimination of the pecuniary interest requirement may be the trend in appeals from actions by nonelected administrative bodies, it should be noted that we are here concerned with a challenge to a taxing ordinance which was enacted by an elected body. Clearly a pecuniary interest would be the type of interest which the legislature would envision as causing a taxpayer to be aggrieved by such an ordinance. Whether any

other type of interest would be so envisioned, especially in a tax enactment, is a question the Court need not now reach.

(3) If the pecuniary interest requirement is eliminated in this case, the effect would be twofold. First, the specific statute involved would be viewed as granting standing to taxpayers whose nonpecuniary interests are affected by an ordinance. The breadth and nature of such interests are not before the Court for consideration. Second, by *dictum* the entire body of administrative law would be altered. I think a more acceptable way of altering the body of law would be on a case by case basis wherein the interest asserted by a plaintiff could be considered in light of the interests which the administrative body is required to consider in making its determinations. Cf. Stewart, *The Reformation of American Administrative Law,* 88 Harv.L.Rev. 1669, 1736 (1975).

(4) Mr. Justice Roberts cites many United States Supreme Court cases in support of his position. The cases do not involve tax statutes which necessarily have as their primary concern pecuniary interests. Further, the complexity of the cases cited and the difficulty that Court generally has in determining whether a certain type of interest affected by an administrative ruling is within the interests the administrative body was required to consider, and if it is, whether it is substantial, indicates Pennsylvania's rule should not be overruled unnecessarily.

(5) The Pennsylvania cases cited by Mr. Justice Roberts are questionable authority for his position. *Azarewicz Liquor License Case,* 163 Pa.Super. 459, 62 A.2d 78 (1948), involved a challenge to the granting of a liquor license for a building within 300 feet of a church. The church clearly had standing without showing a pecuniary interest, not because a pecuniary interest was no longer required generally, but because the legislature gave the Liquor Control Board the specific discretion to refuse a li-

cense to a place within 300 feet of a church. The church interest was clearly identified by the specific grant of discretion. There is no such clearly identified nonpecuniary interest in the statute in question.

The other Pennsylvania case cited is *Frame v. Sutherland,* 459 Pa. 177, 327 A.2d 623 (1974). That case involved the interest of a senator in confirming or rejecting gubernatorial appointments. Mr. Justice Roberts states that the case eliminates the pecuniary requirement by implication. The opinion did not discuss standing. The case did not involve an administrative body, nor a delegation of power to an elected body. The policy considerations in allowing standing in such a case without a showing of pecuniary interest are vastly different than a case involving an appeal from an order of an elected administrative body enacting a tax ordinance.

JONES, C. J., and POMEROY, J., join in this concurring opinion.