## Beauty Hall, Inc. *v.* State Board of Cosmetology, Appellant.

226

Argued March 22, 1965. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Charles A. Woods, Jr.,* Deputy Attorney General, with him *David S. Molod,* Assistant Attorney General, and *Walter E. Alessandroni,* Attorney General, for appellants.

*Robert R. Rice,* with him *Francis B. Haas, Jr., Isadore Gottlieb,* and *McNees, Wallace & Nurick,* for appellee.

*John J. Shumaker,* with him *Carl G. Wass,* and *Shumaker and Placey,* for amici curiae.

OPINION BY MR. JUSTICE COHEN, May 25, 1965:

This is an appeal by the Commonwealth from a final decree which permanently enjoined the State Board of Cosmetology from enforcing a 1959 amendment to the Beauty Culture Law[1] on the grounds that it deprives or interferes with plaintiff-appellee's property rights without due process of law in violation of §1 of the Fourteenth Amendment to the United States Constitution[2] and Article I, §1, of the Pennsylvania Constitution.[3] The decree must be vacated because the financial loss allegedly suffered by appellee does not constitute a deprivation of or interference with property by the state within the meaning of the constitutional provisions asserted by it and does not provide the requisite standing to attack the constitutionality of the 1959 legislative enactment.

Purportedly, the Beauty Culture Law was enacted by the Legislature for "but one purpose, and that is the protection of patrons of . . . beauty shops." *Department of Licenses and Inspections v. Weber,* 394 Pa. 466, 471, 147 A. 2d 326, 328 (1959). One of the methods by which this purpose is secured is the ensuring of the fitness of persons who perform the functions of a beauty operator upon patrons. Thus, these functions cannot be practiced by one who has not obtained a cer-

---

[1] Act of May 3, 1933, P. L. 242, 63 P.S. §507 et seq.

[2] ". . .; nor shall any State deprive any person of . . . property, without due process of law . . . ."

[3] "All men . . . have certain inherent and indefeasible rights, among which are those . . . of acquiring, possessing and protecting property . . . ."

tificate of registration from the Department of Public Instruction.[4]  To obtain such a certificate one must pass an examination promulgated and administered by the State Board of Cosmetology.[5]  Before 1959 there were two basic prerequisites to sitting for the examination—an age requirement of sixteen years and an instruction requirement of one thousand hours in a school of beauty culture registered as such with the Department of Public Instruction.[6]  The plaintiff-appellee, Beauty Hall, Inc., is such a registered school of beauty culture.

In 1959 the Legislature added a third basic prerequisite to sitting for the state examination, viz., a tenth grade education or its equivalent.[7]  It is this amendment which appellee-beauty school attacks.  But this amendment does not direct appellee to do any act or refrain from doing any act.  It does not require appellee to turn away prospective beauty school students who are without a tenth grade education or its equivalent; the educational requirement is a prerequisite to taking the state examination not to entering appellee's school.  Nor is there any suggestion that one of the objects of the Legislature in enacting the amendment was to regulate appellee's affairs.  The ostensible ob-

[4] Act of May 3, 1933, P. L. 242, §2, 63 P.S. §508.

[5] Act of May 3, 1933, P. L. 242, §§3, 11, 12, as amended, 63 P.S. §§509, 517, 518. There are certain exceptions to this requirement. Act of May 3, 1933, P. L. 242, §9, as amended, 63 P.S. §515.

[6] Act of May 3, 1933, P. L. 242, §4, as amended prior to 1959, 63 P.S. §510. An alternative to the one thousand hour beauty school instruction requirement is a two year apprenticeship. Beauty schools, also, must be certificated before teaching students, Act of May 3, 1933, P. L. 242, §2, 63 P.S. §508. They must meet certain requirements under §6 of the act and otherwise are regulated by the State Board of Cosmetology under §11.

[7] Act of November 19, 1959, P. L. 1533, §1, amending Act of May 3, 1933, P. L. 242, §4, 63 P.S. §510. A "good moral character" requirement was also added.

ject of the Legislature in enacting the amendment was the further protection of beauty parlor patrons. The means of obtaining the object is the direct regulation of the individual who desires to become a beauty operator; only this individual is directly burdened by or subject to the amendment.

The sole basis proposed by appellee to support its standing to make a constitutional attack on the amendment is that some persons who would have become tuition paying students in its school in the absence of the new educational requirement will not become its students in the presence of such a requirement and that it thereby has and will continue to suffer financial loss. As stated above, it is clear the amendment does not require such a consequence. But assuming arguendo that appellee could demonstrate that the amendment indirectly causes such an effect, nevertheless there is neither a legal injury nor standing to attack the amendment's constitutionality.

In *Northwestern Pennsylvania Automatic Phonograph Association v. Meadville,* 359 Pa. 549, 59 A. 2d 907 (1948), a corporation, organized and associated for the benefit and protection of persons who owned and installed juke boxes in places of business, sought to enjoin the enforcement of an allegedly unconstitutional license tax imposed upon the proprietors of the establishments where the juke boxes were installed. Plaintiff alleged, inter alia, that the enforcement of these ordinances against the proprietor would result in great loss of business to the owners and installers of the machines, because the taxed proprietors would stop the placing of such machines on their premises. We held at p. 553: "The record does not establish any right in appellant to maintain this bill. The pleadings do not reveal, nor does the record establish, that appellant is in any way subject to the terms of the ordinance. It is not subject to any penalty for neither it

nor its members possess . . . juke boxes within the meaning of the taxing ordinance." We further held that "[i]t is well established that a party challenging the validity of legislation must aver and prove that it is subject to the challenged enactment . . ." and affirmed the dismissal of the bill in equity "for the reason that appellant had no standing to maintain the same."

In *Ex-Cell-O Corporation v. City of Chicago,* 115 F. 2d 627 (7th Cir. 1940), the constitutionality of a Chicago ordinance forbidding the *use* of paper milk containers was attacked by the Ex-Cell-O Corporation, which licensed patented machines used to manufacture such containers, and the American Can Company, which manufactured such containers and sold them to dairy companies. It was held that since the ordinance did not prohibit the licensing by Ex-Cell-O or the manufacturing and selling to dairies by American Can neither company had standing to attack the constitutionality of the ordinance, notwithstanding the serious economic consequences to them. Setting forth numerous cases to the same effect, the court held at p. 629: "[I]t is apparent that inevitable financial pecuniary damage is not the test of the sufficiency of plaintiff's interest. Otherwise the right to sue might be extended indefinitely. . . . [T]he . . . question is whether the damage claimed springs directly to plaintiff from defendants. If it is incidental, if it is indirect, defendants may not invoke the court's jurisdiction."

A similar analysis has been made in cases involving the analogous question of who has standing to appeal from an administrative decision. In *Seitz Liquor License Case,* 157 Pa. Superior Ct. 553, 43 A. 2d 547 (1945), a residential property owner sought to appeal from an order of the Liquor Control Board granting a transfer of a restaurant liquor license to a location near his residence. Not relying solely on the Liquor

Control Act, which expressly gave standing to appeal only to an aggrieved applicant, the court held at p. 556: "The relationship which must exist between a person and a cause before a right to appeal will arise, in the absence of special statutory authority, has been stated as follows in Lansdowne Board of Adjustment's Appeal, 313 Pa. 523, 525, 170 A. 867: ' "A cardinal principle, which applies alike to every person desiring to appeal, whether a party to the record or not, is that he must have a [direct] interest in the subject-matter of the [particular] litigation, otherwise he can have no standing to appeal. And not only must a party desiring to appeal have a [direct] interest in the particular question litigated, but his interest must be immediate and pecuniary, and not a remote consequence of the judgment. The interest must also be substantial." ' Any interest which appellant had in the outcome of the proceedings before the board was not direct and immediate, but was *a collateral concern generated by his desire to protect the value of his property, which might be indirectly affected by the action of the board.* This type of interest, however, is too remote from the issues involved in the transfer proceedings to support a right to an appeal." (Emphasis supplied). See also *Circle Lounge & Grille v. Board of Appeal of Boston,* 324 Mass. 427, 86 N.E. 2d 920 (1949).

The import of these cases is that an adverse, economic impact which is merely an indirect, remote, and nonpurposeful consequence or merely a side effect of the direct, governmental regulation of or imposition of burdens upon other persons does not constitute a deprivation of or interference with property within the meaning of the constitutional provisions asserted by appellee and does not provide standing to attack the constitutionality of that regulation. The judicial power to determine whether constitutional provisions are

". . . transcended either by the legislative act itself or by the administration thereof . . . is delicate in character, one to be exercised with caution and care, for it may result in disapproval of acts of the legislative department or of actions of the executive department, both co-ordinate branches of government. This care, this caution has been proverbially observed by the courts, lest in their zeal to prevent what they deem unjust, they exceed their judicial authority, assert an unwarranted superiority over their co-ordinate governmental branches and invade fields of policy preserved to the legislative arm or the realm of administrative discretion lodged in the executive branch. Obviously such determination may not be had at the suit of any and all members of the public. . . . It can be secured only at the suit of one directly and not remotely interested." *Ex-Cell-O Corporation v. City of Chicago*, supra, at p. 629. Cf. *Knowles's Estate*, 295 Pa. 571, 145 Atl. 797 (1929); *Knup v. Philadelphia*, 386 Pa. 350, 126 A. 2d 399 (1956).

The salutory effect of this principle—one of a number based upon judicial restraint in the field of constitutional litigation[8]—can be demonstrated by a few examples of the consequence of adopting appellee's contrary position that every adverse economic impact is a deprivation of property and will provide a basis

---

[8] "It must be evident to any one that the power to declare a legislative enactment void is one which the judge, conscious of the fallibility of the human judgment, will shrink from exercising in any case where he can conscientiously and with due regard to duty and official oath decline the responsibility." 1 Cooley, Const. Lim. 8th ed., p. 332. See especially the classic opinion of Mr. Justice BRANDEIS, joined in by Justices STONE, ROBERTS, and CARDOZO, in *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 341 (1936), particularly pp. 345-349. See also Jaffe, Standing To Secure Judicial Review: Private Actions, 75 Harv. L. Rev. 255 (1961), for a viewpoint which seems more liberal than that held by Mr. Justice BRANDEIS.

for challenging the due process of the causative governmental action. Vendors of cosmetics could attack the constitutionality of the 1959 amendment on the ground that a decrease in the number of students attending beauty schools decreased their sales of supplies to such schools. Law schools and law text publishers could attack the constitutionality of bar examinations or clerkship requirements on the ground that such regulations tended to discourage prospective students from entering the profession causing a loss of potential customers. Movie theatres could attack the constitutionality of compulsory education laws which deprived them of potential customers during school hours. As the United States Supreme Court said in *Massachusetts v. Mellon,* 262 U.S. 447, 487 (1923) and *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 131 (1940), " '[t]he bare suggestion of such a result, with its attendant inconveniences, goes far to sustain the conclusion which we have reached, that a suit of this character cannot be maintained.' "

While we do not reach the merits of the constitutional issue, the authorities set forth in appellee's brief on the question of the undue "oppressiveness" of regulations which tend to restrict entrance into or pursuance of such occupations as barbering and beauty operating further support our conclusion regarding appellee's constitutional rights and standing. In every case cited by appellee, e.g., *Grime v. Department of Public Instruction,* 324 Pa. 371, 188 Atl. 337 (1936), *Barbers Commission of Mobile County v. Hardeman,* 31 Ala. App. 626, 21 So. 2d 118 (1945), *Hoff v. State,* 197 Atl. 75 (Del. 1938), the attack upon the constitutionality of the regulation was made by the person who was directly regulated or burdened or prevented from free pursuit of his chosen occupation. In none of these cases was the attack made by one who was only indirectly, economically affected by the direct regulatory

impact upon others. Further, in all of these authorities, the constitutional issue is focused in the context of a conflict between the individual's right to obtain the benefits of free competition, unencumbered by restrictions obtained by private interest groups hiding behind police power regulations, and the limited inquiry that courts may properly make into the propriety of police power regulation. There is not the slightest suggestion in these authorities of concern for the type of interest that appellee is asserting.

The authorities cited by appellee to support its argument of unconstitutionality suggest the peculiarity of its position in yet another respect. These authorities, if accepted by this Court as forceful and applicable, would make it difficult to distinguish between those restrictions involved in the Beauty Culture Law that are valid and those that are not. Appellee desires to attack only the 1959 amendment requiring a tenth grade education or its equivalent. But this amendment is part of a larger scheme of examinee fitness which also includes a requirement of one thousand hours of training in beauty culture schools like that operated by appellee. It is not too speculative to suggest that, while beauty schools could operate without the Beauty Culture Law, they were placed in a more favorable economic position by the enactment of the one thousand hour requirement. Obviously, they do not seek its abolition. Retaining the economic benefits flowing from one type of restriction upon the potential beauty operator appellee levels its attack upon another such restriction, which the legislature has purportedly made a part of the general scheme of beauty operator fitness but which is economically adverse to appellee's interest. While we might entertain such a limited attack at the instance of a proper party, the disparity of appellee's economic interests in the restrictive legislation does not sufficiently appeal to the conscience of equity to require it to undertake such a difficult task.

The remoteness of the amendment's impact upon appellee is demonstrated by its proof of how the amendment caused it damage. Obviously it could not show that the amendment *prohibited* persons without a tenth grade education or its equivalent from attending appellee's school or *prohibited* appellee from contracting with, teaching and receiving tuition from such persons. But it also did not show that prospective students decided of their own volition not to enter beauty school when they discovered that they would have to obtain a tenth grade education or its equivalent before taking the state examination. All that appellee showed was that it was *policy* not to accept as students persons who didn't meet the educational requirements for the state examination at the time of their application for entrance into beauty school. The reason for this policy does not clearly appear of record. While we do not doubt that it might be based on some sound business reason, nevertheless, it is not possible to conclude from the proof that the *state deprived* appellee of its property or that the amendment has the kind of regulatory impact on appellee that would give it standing.

The cases relied upon by appellee are clearly distinguishable. In *Dolan College of Embalming, Inc. v. Vaux*, 61 Dauph. 350 (1951), embalming schools attacked a provision that *prohibited* persons who had not served a two year apprenticeship program *from attending* embalming school. In *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), a parochial school attacked an Oregon law requiring attendance at public schools. The Supreme Court stated: "The inevitable practical result of enforcing the act under consideration would be destruction of appellees' primary schools, and perhaps all other private primary schools . . . within . . . Oregon." Id., at p. 534. In effect, children were *prohibited from attending* parochial schools. Indeed, the Act was the vehicle by which the Oregon legislature

purportedly attempted to abolish parochial schools. In *International Ry. Company v. Davidson,* 257 U.S. 506 (1922), the owner and operator of a toll bridge between the United States and Canada was attacking an order of the Secretary of the Treasury requiring the company to take out and pay for a license in order to obtain the service of customs inspectors for its customers on Sundays and holidays. The cost of the license was placed on the company and was in an amount sufficient to compensate the custom officers for Sunday and holiday service. Thus, *International Ry.* involved a direct regulation of the plaintiff company, *Society of Sisters* involved a purposeful abolition of the plaintiff-parochial school and an indirect prohibition of the plaintiff's customer relationships and *Dolan* involved a direct prohibition of customer relationships. None of these cases involved an indirect, remote and nonpurposeful economic loss as a result of the direct regulation of other persons.

Decree vacated with directions to dismiss the complaint. Costs on appellee.

Mr. Justice ROBERTS concurs in the result.