**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| D.M. AND THE PENNSYLVANIA CANNABIS COALITION | : | No. 73 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at 283 MD |
| v. | : | 2023 on August 21, 2024. |
| | : | |
| | : | SUBMITTED: June 17, 2025 |
| 23RD JUDICIAL DISTRICT, BERKS COUNTY | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: PENNSYLVANIA CANNABIS COALITION | : | |
| | : | |

**OPINION**

**JUSTICE MUNDY**                                   **DECIDED: March 26, 2026**

This is a direct appeal from a Commonwealth Court order dismissing a petition for review for lack of standing. The question presented is whether a cannabis trade association has standing to challenge a judicial district's policy concerning the use of medical marijuana by treatment-court participants, based on the alleged financial harm such policy causes to the association's member dispensaries through the loss of sales.

Appellee, the 23rd Judicial District of Pennsylvania (Berks County), offers several treatment court programs designed to help defendants with substance abuse and mental-health issues through a non-adversarial process that integrates legal proceedings and treatment strategies.[1] Per the 23rd Judicial District's policy and procedure manual,

---

[1] These include a DUI treatment court, a veteran's treatment court, a mental health treatment court, and a drug treatment court.

treatment court enrollees are subject to periodic drug testing and are generally prohibited from using opioid-based medications and other addictive medications. As originally conceived, this aspect of the policy prohibited medical marijuana use. Thereafter, in *Gass v. 52nd Judicial District, Lebanon County*, 232 A.3d 706 (Pa. 2020), we held that a judicial district's policy that affirmatively prohibited all probationers and all other individuals under court supervision from using medical marijuana violated the immunity provision of the Medical Marijuana Act (MMA).[2] We clarified, however, that judges and probation officials "may make reasonable inquiries into the lawfulness of" an individual's medical marijuana use. *Id*. at 715. After the *Gass* decision was announced, the 23rd Judicial District amended its policy to state as follows:

> Medical Marijuana use will be addressed on a case-by-case basis. Consideration for use should be accompanied by a letter addressed to the Court from a treating physician that details diagnosis and medical necessity for use.

Berks County Treatment Court, *Policy and Procedure Manual* (March 2023), at 11, *reprinted in* RR. 282a.

Following this policy change, Appellant Pennsylvania Cannabis Coalition (PCC) and D.M., a United States Air Force veteran, jointly filed a petition for review in the Commonwealth Court's original jurisdiction, alleging the amended policy violates the MMA's immunity provision, *see supra* note 2, and requesting declaratory and injunctive relief. They argued the policy allows treatment courts to reject applicants based solely upon their lawful use of medical marijuana, thus violating the MMA as interpreted in *Gass*.

---

[2] Act of April 17, 2016, P.L. 84, No. 16 (reposited at 35 P.S. §§ 10231.101 – 10231.2110). Pursuant to the MMA, patients under a practitioner's continuing care for a serious medical condition may use medical marijuana after, *inter alia*, obtaining a Department of Health identification card and a doctor's certification. *See* 35 P.S. § 10231.403; *Gass*, 232 A.3d at 708. The MMA's immunity provision states that patients shall not be "subject to arrest, prosecution or penalty in any manner, or denied any right or privilege. . . solely for lawful use of medical marijuana . . . in accordance with this act[.]" 35 P.S. § 10231.2103(a).

As for PCC's interest in the matter, they averred PCC is a trade organization comprised of 75% of Pennsylvania permit holders authorized to dispense medical marijuana to patients, including three of the four dispensaries located in Berks County. When patients stop purchasing medical marijuana based on the policy, they asserted, PCC's member dispensaries are financially harmed, and hence, those members are aggrieved by the policy. *See* Petition for Review, at ¶¶ 66, 71, 73, 76. The 23rd Judicial District answered, denying its treatment courts ban the use of medical marijuana, alleging such use is assessed on a case-by-case basis, and asserting some enrollees have been allowed to use medical marijuana while in a treatment court per the amended policy.

Following discovery, the parties filed cross-applications for summary relief in which the threshold question was whether the petitioners had standing.[3] The Commonwealth Court determined D.M. lacked standing in light of his specific circumstances. *See D.M. & the Pa. Cannabis Coal. v. 23rd Judicial Dist., Berks Cnty.*, No. 283 M.D. 2023, *slip op.* at 14 (Pa. Cmwlth. Aug. 21, 2024). D.M. has not challenged that ruling, and it is not before this Court.

Insofar as PCC is concerned, the court indicated an association has standing as a representative of its members if it alleges at least one of its members "is suffering immediate or threatened injury as a result of" the challenged action. *Id.* at 9 (quoting *Ivy Hill Congr. of Jehovah's Witnesses v. DHS*, 310 A.3d 742, 748 (Pa. 2024)). Applying that precept, the court found the asserted financial harm to PCC's members was too remote to confer standing and, as such, PCC lacked associational standing. *See id.* at 14-15. PCC filed a direct appeal to this Court, challenging the Commonwealth Court's holding in this regard. As D.M. has not joined in the appeal, PCC is the sole appellant herein.

---

[3] The only other issue was whether the policy violated the MMA and was thus invalid. The Commonwealth Court did not reach this second issue in light of its resolution of the threshold issue.

Standing is a prudential doctrine designed to protect the courts and the public from "improper plaintiffs," meaning, plaintiffs who have no legally-enforceable interest in the matter complained of. *S. Bethlehem Assocs. v. Zoning Hearing Bd. of Bethlehem Twp.*, 294 A.3d 441, 446-47 (Pa. 2023). The "core concept" of standing is that the litigant must be aggrieved, or "adversely affected," in some way. *Trust Under Will of Ashton*, 260 A.3d 81, 88 (Pa. 2021). Expanding upon this concept, we have held that to show aggrievement, a complaining party's interest must be substantial, direct, and immediate – meaning the party's interest must surpass that of the general public in procuring obedience to the law, the harm alleged must be caused by the matter complained of, and the causal link must not be remote or speculative. *See id*. (citing *In re Milton Hershey Sch.*, 911 A.2d 1258, 1261-62 (Pa. 2006)).

An association such as PCC has standing to commence litigation, absent injury to itself, if it alleges at least one of its members has suffered, or will suffer,[4] an immediate or threatened injury as a result of the challenged action. *See Firearms Owners Against Crime v. Papenfuse*, 261 A.3d 467, 473-74 (Pa. 2021). In practice, this means the association must "establish[] that at least one of its members has standing individually." *Shirley v. Pa. Legis. Reference Bureau*, 318 A.3d 832, 852 (Pa. 2024). As applied here, PCC has standing if at least one of its member dispensaries has a "substantial," "direct," and "immediate" interest affected by the 23rd Judicial District's medical-marijuana policy.

It is undisputed that the 23rd Judicial District's policy does not regulate medical marijuana dispensaries. PCC's argument is that it regulates treatment-court applicants in a way that financially affects dispensaries. The issue before this Court is whether such alleged financial consequences are sufficient to comply with the standing litmus as delineated above, or whether instead they are remote or speculative. This question

---

[4] *See Barbieri v. Shapp*, 383 A.2d 218, 221 (Pa. 1978).

implicates the third prong of the standing litmus, concerning whether PCC members' interest is "immediate." *Accord* Brief for Appellant at 13.

In analyzing whether PCC's allegations establish aggrievement sufficient to confer standing, we find our decision in *Beauty Hall v. State Board of Cosmetology*, 210 A.2d 495 (Pa. 1965), instructive. In that matter, this Court held that a beauty school lacked standing to challenge a Pennsylvania statute requiring individuals to have a 10th grade education to sit for the state beauty licensing exam. The school alleged the law would reduce the number of tuition-paying students. We found no legal injury to the school as the law did not regulate the school's conduct. The fact some students might decide not to enroll due to the lack of a tenth-grade education was deemed a "collateral concern." *Id*. at 498. Therein, we surveyed other standing decisions and concluded their import was that "an adverse, economic impact which is merely an indirect, remote, and nonpurposeful consequence or merely a side effect of the direct, governmental regulation of or imposition of burdens upon other persons does not constitute a deprivation" sufficient to confer standing. *Id*.

The *Beauty Hall* Court also differentiated other cases where standing was found to exist. In *Pierce v. Society of Sisters*, 268 U.S. 510 (1924), a parochial school had standing to challenge a law requiring attendance at public schools because the inevitable effect was to abolish parochial schools. In *International Railway Company v. Davidson*, 257 U.S. 506 (1922), a company that owned toll bridges connecting the United States to Canada had standing to challenge a federal order ceasing customs operations on Sundays and holidays unless the company paid extra compensation to customs officials and posted a bond. The *Beauty Hall* Court concluded those cases involved either direct regulation of the plaintiff's activities or a purposeful abolition of the plaintiff's business. *See Beauty Hall*, 210 A.2d at 500-01. *Beauty Hall* also distinguished a common pleas

court decision where an embalming school had standing to challenge a provision prohibiting persons who had not served a two-year apprenticeship from attending such schools, as that involved direct interference in customer relationships. None of those cases "involved an indirect, remote and nonpurposeful economic loss as a result of the direct regulation of other persons." *Id*. at 501.

PCC disputes the application of *Beauty Hall* to the instant controversy. It relies on *Pennsylvania State Education Association v. Public School Employees' Retirement Board*, 311 A.3d 1017 (Pa. 2024) (PSEA), and *William Penn Parking Garage v. City of Pittsburgh*, 346 A.2d 269 (Pa. 1975), for the position that standing may be found based on the "downstream consequences" or "secondary effects" of the challenged regulation. Reply Brief for Appellant at 7-9.

*PSEA* was a declaratory judgment action in which a union and the state public school employees' retirement board had varying interpretations of legislation, and if the board's interpretation – memorialized in a resolution – continued in effect, it would have substantially interfered with the union's ability to negotiate effectively concerning subcontracting employment decisions by school districts. The *status quo* established by the resolution, and challenged by the union, placed the union "in an inferior bargaining position" relative to such employment decisions. *PSEA*, 311 A.3d at 1030. Because this was characterized as a "downstream consequence" of the resolution, *id*. at 1029, PCC reasons that, here too, the potential downstream consequences of the 23rd Judicial District's policy give rise to standing. But the consequences in *PSEA* were direct and immediate. *See id*. at 1030 ("*Right at the moment*, the union has a problem") (emphasis added). Here, any alleged downstream consequences to PCC's members are more remote and attenuated than in *PSEA*. Thus, even if we assume, *arguendo*, that PCC's

interests can be characterized as direct, nothing in *PSEA* dictates a conclusion that they are immediate.

Nor does *William Penn Parking* aid PCC's position. The relevant holding in that litigation was that the operators of private parking lots had standing to challenge a tax levied upon their patrons pursuant to a Pittsburgh local ordinance, given that the tax was imposed directly on the interchange between the patrons and the parking lot operators. *See id*. at 289 (noting the tax was "levied upon the very transaction between them"). Here, by contrast, nothing in the policy imposes a tax or other legal burden upon transactions between PCC's members and individual patients. Indeed, the *William Penn Parking* Court expressly distinguished *Beauty Hall* on this basis, observing the tax imposed upon transactions entered into by the parking lot operators made their complaint different from that of the beauty school and more akin to the harm suffered by the parochial schools in *Pierce*. *See id*. at 289 & n.36.

PCC also relies on a passage in *William Penn Parking* indicating that an earlier decision, *Northwestern Pennsylvania Automatic Phonograph Association v. Meadville*, 59 A.2d 907 (Pa. 1948), should be overruled because it is not in line with the "modern trend" of enlarging the class of parties who may challenge governmental action. *William Penn Parking*, 346 A.2d at 290. The facts in *Automatic Phonograph* were analogous to those in *William Penn Parking*. A municipality enacted an ordinance that imposed a juke box licensing fee on any business that maintained a jukebox on its premises. This affected the plaintiff's members, which consisted of corporations that owned and leased jukeboxes to the businesses in question. The direct effect of the ordinance placed a burden on such lease transactions in light of the lessee's obligation to pay the fee any time it leased a jukebox for on-premises use. The city in *William Penn Parking* and this Court in *Automatic Phonograph* reasoned that only the person actually liable for, or required to pay, the tax

or fee in question, is aggrieved by it, and *William Penn Parking* rejected that premise as an improper application of the criteria for standing. *See id*. at 288-89.[5]

Here, PCC's complaint is that the policy will lead some individuals to cease purchasing marijuana, which will financially harm its members. But this asserted causal

---

[5] In light of this distinction between *Automatic Phonograph* and the present case, and our acknowledgement that *William Penn Parking* overruled that decision, the dissent is incorrect in stating we presently "resurrect" *Automatic Phonograph*. Dissenting Op. at 11. Furthermore, while the dissent criticizes our decision to follow *Beauty Hall*, *see id*. at 9, that decision has never been disapproved, and the parties do not ask us to overrule it.

As for the dissent's reference to *Robinson Township v. Commonwealth*, 83 A.3d 901 (Pa. 2013), *see* Dissenting Op. at 10, that dispute involved a challenge under Article I, Section 27 of our state Constitution – known as the Environmental Rights Amendment – to Act 13 of 2012, which comprised "sweeping legislation affecting Pennsylvania's environment and, in particular, the exploitation and recovery of natural gas in a geological formation known as the Marcellus Shale." *Robinson Twp.*, 83 A.3d at 913. Standing was recognized in favor of an associational plaintiff, the Delaware Riverkeeper Network, that claimed Act 13 would adversely affect its members' "health and their ability to enjoy natural beauty, environmental resources, and recreational activities in the Delaware River corridor, such as fishing, boating, swimming, and bird-watching." *Id*. at 921. This Court recounted that the property owners

> asserted that they are likely to suffer considerable harm with respect to the values of their existing homes and the enjoyment of their properties given the intrusion of industrial uses and the change in the character of their zoning districts effected by Act 13. These individual members [of the associational plaintiff] have a substantial and direct interest in the outcome of the litigation premised upon the serious risk of alteration in the physical nature of their respective political subdivisions and the components of their surrounding environment. This interest is not remote.

*Id*. at 922 (citation omitted). Thus, the primary interests in view pertained to the enjoyment of a clean environment, the need for local zoning limitations, and the enjoyment and value of real property. *See also id*. at 952 (highlighting the judiciary's obligation to vindicate Section 27 environmental rights). These interests were directly undercut by Act 13 which preempted existing local oil and gas regulations.

We do not believe *Robinson Township*'s analysis is easily transportable into a case like this one, which has nothing to do with environmental rights and instead involves a speculative loss of money from reduced marijuana transactions. The claim made by the Coalition here is more akin to the one involved in *Beauty Hall* than to the contentions forwarded by the Delaware River Keeper in *Robinson Township*.

connection is not as direct as in *William Penn Parking* and *Automatic Phonograph*. For the policy to result in such harm, a number of events tangential to the dispensaries' business must occur. First, a dispensary customer or likely customer must be charged with a crime. The customer or likely customer, now a criminal defendant, must be referred to a treatment court. The defendant must then choose to apply for entry into treatment court rather than proceed through the ordinary criminal process. The defendant must then meet all eligibility requirements, and, if deemed eligible, must undergo a multi-step screening process. The treatment court team, after reviewing the information from the intake and evaluation process, must then decide to transfer the defendant into a treatment court program rather than denying the application. Once in the program, the defendant's use of medical marijuana is evaluated on a case-by-case basis and subject to the court's discretion. For a dispensary to be affected (assuming it is one of PCC's members), the court must then exercise its discretion to deny the defendant's request to continue using medical marijuana.[6]

To the degree PCC may be seen as arguing this chain of events might nonetheless occur, such contention pertains to the directness qualifier, which asks if a causal connection exists, rather than the immediacy requirement, which relates to the remoteness of that connection. To illustrate, the *William Penn Parking* Court compared two cases in which a horse racing license applicant challenged the licensure of other applicants. Where all four available licenses had been awarded to others, standing was present as there was no possibility of the plaintiff obtaining one; whereas, where only one of the four licenses had been awarded, standing was absent. *See William Penn Parking*, 346 A.2d at 283-84. More to the point, the result in *Beauty Hall* depended on the

---

[6] These procedures are reflected in treatment court's policy and procedure manual. *See* RR. 271a-284a.

circumstance that the challenged statute did not regulate the school or impose a burden on transactions between the school and tuition-paying students, and not on whether the school was able to show that one or more students in fact decided not to enroll as a result of the statute's enactment.

The *William Penn Parking* Court indicated further that in close cases standing will more readily be found where the type of interest asserted "is among the policies underlying the legal rule relied upon by the person claiming to be aggrieved." *Id*. at 284; *see also Ken R. on Behalf of C.R. v. Arthur Z.*, 682 A.2d 1267, 1270 (Pa. 1996) (explaining that an immediate harm is demonstrated where the interest the party seeks to protect "is within the zone of interests sought to be protected by the statute or constitutional guarantee in question").[7] In the present case, PCC's member dispensaries have an interest in not losing income from reduced marijuana sales. Economic actors have a legitimate interest in pursuing financial remuneration for goods and services lawfully rendered, and thus, they may complain about pecuniary loss. *Accord William Penn Parking*, 346 A.2d at 289. Still, the MMA's immunity provision is not designed to protect that type of interest. It is intended, rather, to ensure the availability of safe and effective treatment and therapy options via access to medical marijuana through traditional medical and pharmaceutical avenues. *See* 35 P.S. § 10231.102 (declaration of policy). Thus, to the extent this is a close case, a zone-of-interests consideration does not favor PCC's position.[8]

---

[7] "A zone of interests analysis may be employed where a party's immediate interest is not apparent, but it is merely a guideline that may be used to find immediacy, not an absolute test." *PSEA*, 311 A.3d at 1032 (internal quotation marks and emphasis removed) (citing *Johnson v. American Standard*, 8 A.3d 318, 333-34 (Pa. 2010)); *see also Johnson*, 8 A.3d at 331 (noting Pennsylvania law does not require that a plaintiff be in the zone of interests for the immediacy prong of a standing analysis to be satisfied).

[8] PCC argues a zone-of-interest evaluation favors it because dispensaries are included in the MMA's immunity provision and protected from being prosecuted or penalized in any (continued…)

For the reasons given above, we conclude the Commonwealth Court properly held PCC lacked standing to challenge the 23rd Judicial District's amended policy. In light of its justiciability determination, it appropriately declined to reach the substantive issue raised. Accordingly, we affirm its order.

Chief Justice Todd and Justices Dougherty and Brobson join the opinion.

Justice Donohue files a dissenting opinion in which Justices Wecht and McCaffery join.

---

way solely for dispensing medical marijuana. *See* Brief for Appellant at 18. However, the interest presently asserted by PCC on behalf its members does not pertain to a fear they will be prosecuted or penalized, but that they will lose sales. *See id*. at 10-12, 14.