**[J-57-2025] [MO: Mundy, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| D.M. AND THE PENNSYLVANIA CANNABIS COALITION | : | No. 73 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at 283 MD |
| v. | : | 2023 on August 21, 2024 |
| | : | |
| | : | SUBMITTED: June 17, 2025 |
| 23RD JUDICIAL DISTRICT, BERKS COUNTY | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: PENNSYLVANIA CANNABIS COALITION | : | |
| | : | |

**DISSENTING OPINION**

**JUSTICE DONOHUE**                    **DECIDED: March 26, 2026**

Because the Majority erases over fifty years of standing jurisprudence in our Commonwealth, I dissent. Under our established case law, the Pennsylvania Cannabis Coalition ("PCC") established that it has standing to bring this challenge, and the case should be remanded to the lower court to address the merits of PCC's claims.

Issues of standing present questions of law for which our standard of review is de novo, and our scope of review is plenary. *Allegheny Reproductive Health Center v. Pa. Dep't of Hum. Servs.*, 309 A.3d 808, 831 (Pa. 2024). Standing is a matter of justiciability, "implicating a court's ability to adjudicate a matter." *Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467, 481 (Pa. 2021). We "must resolve justiciability concerns as a threshold matter before addressing the merits of the case[,]" to ensure that we do not issue "inappropriate advisory opinions." *Id.* Our standing doctrine is "a prudential, judicially-created tool," affording the courts discretion in making such determinations. *Id.*

As we have observed, "[i]n contrast to the federal approach, notions of case or controversy and justiciability have no constitutional predicate, do not involve a court's jurisdiction, and are regarded as prudential concerns implicating courts' self-imposed limitations." *Robinson Twp. v. Commonwealth*, 83 A.3d 901, 916-17 (Pa. 2013). In essence, this means that standing in Pennsylvania courts is granted more liberally than in federal courts. *Allegheny Reproductive Health Center*, 309 A.3d at 832.

To establish standing, a putative plaintiff must demonstrate that they have been "aggrieved" by the challenged conduct. *Id.* To determine that a party is aggrieved for purposes of standing, we examine whether they have a substantial, direct, and immediate interest in the outcome of the litigation. *Id.* "A party's interest is substantial when it surpasses the interest of all citizens in procuring obedience to the law; it is direct when the asserted violation shares a causal connection with the alleged harm; finally, a party's interest is immediate when the causal connection with the alleged harm is neither remote nor speculative." *Commonwealth v. Donahue*, 98 A.3d 1223, 1229 (Pa. 2014). Accordingly, the question is whether PCC has established that its interest with respect to the policy of the 23rd Judicial District, Berks County Court of Common Pleas ("Judicial District") is substantial, direct and immediate. This Court has explained that a non-profit, such as PCC, can demonstrate it has associational standing "as a representative of its members, even in the absence of injury to itself, if it establishes at least one of its members has standing individually." *Shirley v. Pa. Legis. Reference Bureau*, 318 A.3d 832, 852 (Pa. 2024).

Although the Majority does not concede that PCC has established that its interest is substantial and direct, its analysis focuses exclusively on the third prong of our standing test: whether PCC's interest is immediate. Majority Op. at 4-6. To fully establish why I

am of the position that PCC has standing to bring this lawsuit, I will set forth why it has satisfied all three prongs of our standing analysis.

## I. Substantial

PCC contends that its interest is substantial because its member dispensaries are financially harmed when patients stop using medical marijuana to comply with the policy. PCC's Brief at 11-12. The Judicial District counters this by arguing that PCC's issue is not with the policy but with individual judicial decisions and the outcome of criminal proceedings. Judicial District's Brief at 18-19. In so arguing, the Judicial District suggests that PCC's financial motives are simply in conflict with these judicial determinations. *Id.* at 18.

I disagree with the Judicial District's assertion that PCC's claim is a challenge to judicial discretion in individual criminal cases rather than the policy itself. It is the policy's allowance of discretion in the trial court to render medical marijuana users ineligible for participation in the program that harms PCC. Thus, it is the source of the jurists' discretion (i.e., the policy), not the exercise of that discretion itself that PCC challenges. However, the Judicial District has offered little other opposition to PCC's claim of a substantial interest.

As PCC has set forth, its members are dispensaries licensed by the Commonwealth to sell medical marijuana to authorized patients. Three out of the four medical marijuana dispensaries in Berks County are included among PCC's members. PCC has alleged that in at least two instances, medical marijuana patients have ceased purchasing medical marijuana from its member dispensaries as a direct result of the policy; and it avers that this number may be even greater. Petition for Review, ¶¶ 74-81. The Judicial District has not challenged this assertion, and the Commonwealth Court seems to have acknowledged that PCC's members experienced some pecuniary harm.

*D.M. v. 23rd Jud. Dist.*, 283 MD 2023, 2024 WL 3886657, at *7 (Pa. Commw. Aug. 21, 2024) (acknowledging PCC's members have experienced "the loss of some sales under the Policy").

A substantial interest "must have substance," meaning beyond that of the rest of the citizenry. *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 282 (Pa. 1975). The average citizen is unlikely to have an interest in the eligibility requirements for a judicial district's treatment courts. Nor would the average citizen have an interest in the particular business of medical marijuana distributors. PCC, however, is interested in the impact of the Judicial District's policy and its eligibility requirements because of the impact on medical marijuana dispensaries' business in Berks County. The substance of its interest, therefore, is pecuniary in nature, which is a relevant harm for our standing analysis. As we explained in *William Penn Parking*, "there is no minimum threshold on its magnitude[,]" meaning that we do not attribute a dollar amount to the degree of harm for the purpose of establishing a substantial interest pursuant to our standing analysis. *Id.* Because PCC's members have experienced a loss of revenue due to the policy, I find PCC's interest to be substantial.

## II. Direct

A party's interest is direct when it can demonstrate that there is a causal connection between the harm and the asserted violation. *Firearm Owners Against Crime*, 261 A.3d at 473. In other words, a party has a direct interest in the litigation so long as the challenged law causes harm to the party's interests and remedying that violation would in turn remove the harm.

It is PCC's position that its interest is direct because by prohibiting certain patients from using its members' products, the policy causes its members to lose revenue. PCC's Brief at 12. The alleged financial injury, PCC argues, "would be obviated if the Policy

were enjoined." *Id.* In response, the Judicial District argues that PCC's harm is not direct, because the policy affects how criminal defendants seek voluntary treatment court programs, but it does not require any action from PCC or prohibit PCC's members from selling medical marijuana or otherwise penalize them. Judicial District's Brief at 23.

The Judicial District mischaracterizes what constitutes a direct interest for purposes of our standing analysis. Under its rationale, standing could only be established when the challenger is directly regulated by the statute or policy at issue. However, a party may still have a direct interest in the outcome of the litigation even if the policy does not directly regulate the challenger's conduct. In *Pennsylvania State Education Association v. Public School Employees' Retirement Board*, 311 A.3d 1017 ("*PSEA*"), for example, a labor organization representing public school employees challenged a Public School Employees' Retirement Board ("PSERB") regulation that directly applied to school districts, rather than its employees or related labor unions. However, this policy adversely impacted the labor organization's members by placing them in inferior bargaining positions with the school districts. *PSEA*, 311 A.3d at 1021-22. Despite the policy not directly regulating the labor organization or its members' conduct or operations, we found that the labor organization was able to "easily establish" it had standing due to the "downstream consequences" of PSERB's policy. *Id.* at 1029. We explained that "[t]he consequences of a statute, or of an agency's interpretation of that statute, can extend to others beyond those expressly targeted." *Id.* The same is true here.

As explained in the above substantial interest discussion, PCC's alleged harm is pecuniary in nature. It has alleged that this pecuniary harm is a downstream consequence of the Judicial District's policy, because while it expressly targets potential participants in treatment courts, the effects of this regulation are borne by PCC's

members. Therefore, declaring the policy invalid would obviate PCC's injuries. Accordingly, I find that PCC has a direct interest in this matter for purposes of standing.

### III. Immediate

An interest is immediate when the nature of the causal connection is neither remote nor speculative. *PSEA*, 311 A.3d at 1024. PCC alleges that, as a consequence of the policy, at least two individuals have stopped purchasing medical marijuana in Berks County, and it avers that this number may be higher. PCC's Brief at 13-14. Because there are only four dispensaries in Berks County and three of those dispensaries are members of PCC, it is PCC's members that will feel the effects when treatment court participants in Berks County cease their purchase of medical marijuana. This, it argues, goes beyond setting financial barriers by prohibiting some individuals from purchasing PCC members' products entirely. *Id.* at 14. Accordingly, it concludes that its harm cannot be considered remote or speculative.

The Judicial District responds that whether a treatment court participant may use medical marijuana is "too far removed" from PCC's financial harm, as "the Policy's requirements … do not address making purchases at dispensaries." Judicial District's Brief at 24-25, 28. The Judicial District likens this case to our 1965 decision in *Beauty Hall, Inc. v. State Board of Cosmetology*, 210 A.2d 495 (Pa. 1965), where this Court held that a beauty school could not challenge a statute requiring applicants to have at least a tenth-grade education to sit for the beautician licensing exam. *Id.* at 27. In that case, we opined that the beauty school was not directly regulated by the tenth-grade education requirement and therefore had no standing to challenge it. The Judicial District contends that PCC's position is no different than that of the beauty school because the policy does not directly regulate the affairs of PCC or its members. *Id.* at 28.

Like the Judicial District, the Majority's analysis hinges on its interpretation of *Beauty Hall*. Majority Op. at 5. The Majority finds that our decision in *Beauty Hall* "depended on the circumstance that the challenged statute did not regulate the school or impose a burden on transactions between the school and tuition-paying students, and not on whether the school was able to show that one or more students in fact decided not to enroll as a result of the statute's enactment." *Id.* at 9. I disagree with the Majority's suggestion that the *Beauty Hall* decision "depended" only on this distinction. The *Beauty Hall* Court noted that the "remoteness of the amendment's impact" was demonstrated by its lack of proof. *Beauty Hall*, 210 A.2d at 500. Specifically, it explained that there was nothing in the record to "show that prospective students decided of their own volition not to enter beauty school when they discovered that they would have to obtain a tenth grade education or its equivalent before taking the state examination." *Id.* This was not the only reason we did not find standing in *Beauty Hall*, but it certainly was not an insignificant part of that decision.

The crux of *Beauty Hall*'s rationale was its reliance on case law "that an adverse, economic impact which is merely an indirect, remote, and nonpurposeful consequence or merely a side effect of the direct, government regulation or imposition of burdens upon other persons" cannot establish immediacy for purposes of standing. *Id.* at 498. In reaching that conclusion, the *Beauty Hall* Court relied upon three other decisions. First among those cases was *Northwestern Pennsylvania Automatic Phonograph Association v. Meadville City*, 59 A.2d 907 (Pa. 1948), *overruled by William Penn Parking*, 346 A.2d 269 ("We conclude that … *Northwestern Pennsylvania Automatic Phonograph Association* should be overruled."). There, an association of owners of jukeboxes that leased their machines to others were challenging the collection of taxes levied upon those who kept juke boxes on their premises. *Id.* at 908. In other words, proprietors who rented

the machines would be paying additional taxes by virtue of having a jukebox on the premises. *Id.* Thus, the jukebox owners asserted that they would suffer losses because the taxed proprietors would no longer have the machines placed on their premises to avoid paying the taxes. Ultimately, we held that because the jukebox owners were not directly "**subject to** the challenged enactment[,]" they had no standing to challenge the taxing ordinance. *Id.* at 909 (emphasis added).

The next case relied upon by the *Beauty Hall* Court was *Ex-Cell-O Corp. v. City of Chicago*, 115 F.2d 627 (7th Cir. 1940), a case from a federal court relying on federal standing principles. In that case, the Ex-Cell-O Corporation, which licensed patented machines used to manufacture paper milk containers, challenged Chicago's ordinance prohibiting the use of paper milk containers. *Id.* at 628-29. The Seventh Circuit recognized that Ex-Cell-O Corporation would be subject to "inevitable financial pecuniary damage[,]" but all that mattered for the purposes of its standing inquiry was "whether the **damage claimed springs directly to plaintiff** from defendants. If it is incidental, if it is indirect, defendants may not invoke the court's jurisdiction." *Id.* at 629 (emphasis added).

The *Beauty Hall* Court then moved on to *In re Seitz*, 43 A.2d 547 (Pa. Super. 1945), which involved a residential property owner seeking to appeal the Liquor Control Board's order granting a restaurant liquor license to a location near his home. *Id.* at 547. The Superior Court rejected the property owner's interest as being direct and immediate because it found that his interest "was not direct and immediate, but was **a collateral concern generated by his desire to protect the value of his property, which might be indirectly affected** by the action of the board." *Id.* at 548 (emphasis added).

Based on these cases, the conclusion drawn by the *Beauty Hall* Court was that only those who are the direct subject of the challenged legislation can have a direct and immediate interest for purposes of asserting standing. At that time, the Court would not

find standing for those putative plaintiffs who were "only indirectly economically affected by the direct regulatory impact upon others." *Id.* at 499. By hitching its immediacy analysis to *Beauty Hall*, the Majority is advocating for the regression of our standing principles, setting our standing jurisprudence back decades. Such a decision calls into question countless standing decisions by this Court since 1965.

In *William Penn Parking*, we held that operators of private parking had standing to challenge a Pittsburgh tax levied on parking lot patrons. *William Penn Parking*, 346 A.2d at 290-91. There, we distinguished *Beauty Hall* based on the fact that there was no recorded or otherwise identifiable burden on the transaction between the beauty school and its prospective pupils. *Id.* at 290. We then proceeded to address the primary authority from this Court upon which the *Beauty Hall* Court relied: *Northwestern Pennsylvania Automatic Phonograph Association*. *Id.* This Court reasoned that our decision in *Northwestern Pennsylvania Automatic Phonograph Association* should be overruled because it "exhibit[ed] an insufficient appreciation of the importance of secondary effects" with respect to a standing analysis. *Id.* As the *William Penn Parking* Court explained, "the injury caused by secondary effects of an action may sometimes be as great or greater than that caused by its primary effects." *Id.* In other words, our understanding of who has standing to challenge laws evolved. No longer would we only consider those who were the direct subject of a law to have standing, but also those who could demonstrate that a "secondary effect" of that law caused them to be aggrieved, as well. This we considered to be part of the "modern trend … toward enlargement of the class of people who may protest (governmental) action." *Id.* (citations and quotations omitted).

To my mind, our decision in *William Penn Parking* demarcated the transition from the *Beauty Hall* approach to standing to our modern approach.[1] In so doing, *William Penn Parking* called into question the central reasoning of not only *Northwestern Pennsylvania Automatic Phonograph* but that of *Beauty Hall*, as well. In embracing the "modern trend" towards standing, the *William Penn Parking* Court distanced itself from those earlier cases that resigned themselves to only find that a party had a direct and immediate interest if the challenger was the direct subject of the challenged law. *See Nw. Pa. Automatic Phonograph Ass'n*, 59 A.2d at 909 (finding that putative plaintiffs lacked a direct and immediate interest because they were not "subject to the terms of the ordinance"); *Beauty Hall*, 210 A.2d at 498 (finding that a putative plaintiff lacked a direct and immediate interest where the impact is "merely a side effect of the direct, government regulation").

Not only was *Northwestern Pennsylvania Automatic Phonograph* expressly rejected by this Court, but future decisions of this Court also demonstrated why the other cases relied upon by *Beauty Hall* to establish its standing framework are inapt under our modern standing jurisprudence. For example, in *Robinson Township* we addressed the standing of several plaintiffs that challenged Act 13, a legislative scheme that sought to preempt and supersede local regulation of oil and gas operations. *Robinson Township*, 83 A.3d at 936. This legislation required, inter alia, that municipalities allow natural gas

---

[1] The Majority is correct that the parties have not asked us to overrule *Beauty Hall*. Majority Op. at 8 n.5. That is because there is no reason to do so. After *William Penn Parking*, this Court has only cited *Beauty Hall* twice and only for very general propositions unrelated to its standing principles. *See Guthrie v. Borough of Wilkinsburg*, 478 A.2d 1279, 1282 (Pa. 1984) (noting generally that due process cannot protect a right that is too remote or speculative); *Goodheart v. Casey*, 565 A.2d 757, 760 (Pa. 1989) (noting that "[i]t is the sole function of the judiciary to interpret the constitutional mandate, including the intended use of powers conferred upon the legislature"). This Court has distanced itself from *Beauty Hall* and its rationale over the decades, leaving it an unsuitable relic of our prior standing jurisprudence. That is, until the Majority's decision today.

development in residential zones. *Id.* at 931. Among those plaintiffs were landowners who were also members of the Delaware Riverkeeper Network, a non-profit environmental group and another plaintiff challenging Act 13. *Id.* at 914. We found that Act 13 posed a risk to those landowners because they were "likely to suffer considerable harm with respect to the values of their existing homes and the enjoyment of their properties" as a potential consequence of Act 13. *Id.* at 922. This Court expressly held that "[t]his interest [was] not remote." *Id.*

If we had applied this Court's rationale in *Northwestern Pennsylvania Automatic Phonograph*, the Seventh Circuit's rationale in *Ex-Cell-O Corp.*, or the Superior Court's rationale in *In re Seitz*, it is unlikely that this Court would have found that the landowners in *Robinson Township* had standing because they were not the target of the legislative scheme.[2] *See, e.g.*, *Ex-Cell-O Corp.*, 115 F.2d at 629 (explaining that even if the plaintiff was inevitably subject to financial damage, all that mattered for establishing standing was "whether the damage claimed springs directly to plaintiff from defendants"); *In re Seitz*, 43 A.2d at 548 (rejecting property owner's standing because his interest "was a collateral concern generated by his desire to protect the value of his property, which might be indirectly affected"). However, these are the cases and the holdings that the *Beauty Hall* Court relied on to establish its standing jurisprudence. By virtue of its reasoning, these are precisely the standing principles the Majority would have us resurrect today.[3]

---

[2] My reference to *Robison Township* is not to suggest that the Majority look to that case as controlling in the instant matter, but rather to highlight an example of how the Majority's resurrection of *Beauty Hall* and its standing jurisprudence is incongruent with our modern approach to standing. Under the Majority's preferred framework, standing could not have been established by the facts set forth in *Robinson Township*.

[3] Despite the Majority's recognition that *William Penn Parking* overruled *Northwestern Pennsylvania Automatic Phonograph*, Majority Op. at 7, by endorsing *Beauty Hall*, the Majority is endorsing its rationale. *Beauty Hall*'s rationale stemmed directly from antiquated precepts of standing set forth in cases that only recognized standing for parties (continued…)

Putting aside concerns that the Majority's rationale would revert our standing jurisprudence by decades, the instant case is easily distinguishable from *Beauty Hall*. In *Beauty Hall*, we found that there was no suggestion—either by virtue of the law itself or as indicated by the record—that prospective students chose not to enter the beauty school due to the policy that required them to obtain a tenth-grade education prior to taking the licensing exam. *Beauty Hall*, 210 A.2d 501. Those prospective students were still free to enroll in the school if they so desired. Accordingly, there was no burden whatsoever on the transaction between the school and its potential pupils. *Id*. Without any demonstrable reduction in students or apparent reason as to why the law would have this impact, we found that it was too far removed to establish that the beauty school had an immediate interest. *Id*

Here, unlike *Beauty Hall*, the policy actually burdens the transaction between PCC's members and those treatment court participants subject to the policy. *See William Penn Parking*, 346 A.2d at 289 ("[T]he fact that the regulation tended to prohibit or burden transactions between the plaintiff and those subject to the regulation sufficed to afford the plaintiff standing."). PCC alleges that, as a consequence of the policy, at least two individuals have stopped purchasing medical marijuana in Berks County, and it avers that this number may be higher. *See Robinson Twp*., 83 A.3d at 922 (an organization need only allege "that at least one of its members is suffering immediate or threatened injury as a result of the action challenged" to establish it has standing). Because there are only four dispensaries in Berks County and three of those dispensaries are members of PCC, it is PCC's members that will feel the effects when treatment court participants in Berks

directly targeted by the challenged legislation. *See Beauty* Hall, 210 A.2d at 497 (citing *Nw. Pa. Automatic Phonograph Ass'n*, 59 A.2d at 909; *Ex-Cell-O Corp.*, 115 F.2d at 629; *In re Seitz*, 43 A.2d at 548). The Majority is not simply resurrecting a single case, but rather an entire body of case law that this Court has continually distanced itself from for over fifty years.

County cease their purchase of medical marijuana. This effect is not too remote, but rather it is only one step removed from the express target of the policy, i.e., the treatment court participants. *Id.* (finding an immediate interest when "the effect of the tax upon their business is removed from the cause by only a single short step").

In applying its analysis, the Majority has opted to apply a step-by-step recitation of every minute event that must take place between an action taken pursuant to the policy and the impact on PCC's members. Majority Op. at 8.[4] While I acknowledge that we do not have an established procedure for tracing the remoteness of a purported interest, I find the Majority's process here to be troubling. If we were to conduct this type of inquiry in other standing cases, we would rarely find a party to have an immediate interest.[5]

By way of example, in *Firearm Owners Against Crime*, 261 A.3d 467, we could have drawn out each individual step to illustrate how the challenged law could cause the harm. In that case, we addressed whether Firearm Owners Against Crime ("FOAC"), "a statewide, non-partisan political action committee" with members actively working to preserve firearm rights could challenge ordinances in Harrisburg.[6] *Id.* at 470. Under the

---

[4] The Majority appears to be suggesting that this "chain of events" that it lays out only "pertains to the directness qualifier, … rather than the immediacy requirement[.]" Majority Op. at 8. However, as the Majority acknowledges, the directness qualifier is answered by whether there exists a causal chain connecting the law to the purported harm. *Id.* The immediacy factor, on the other hand, asks us to address how long that chain is, which is hypothetically what is being reviewed in the Majority's "chain of events." Here, PCC has alleged that at least two and likely more individuals have ceased purchasing medical marijuana from their members as a result of the relevant policy. The chain exists, and thus its interest is direct.

[5] Additionally, I would note that that Majority's "chain of events" is misleading. It is not necessary that the court actually deny a defendant's request to continue using medical marijuana for the PCC's members to experience their purported harm. All that needs to occur is that an individual stops purchasing medical marijuana in order to comply with the Judicial District's policy at whatever stage of the process that may be.

[6] Those ordinances were as follows:

(continued…)

Majority's approach, we would first have to find that the individual owned a firearm; that the individual was physically in Harrisburg; that the individual committed one of the multi-step prohibited acts in one of the specified locations;[7] that the individual's conduct was discovered by law enforcement; that law enforcement charged that individual with

> The "Discharge Ordinance," Code Section 3-345.2 - originally adopted in 1821 - which restricts the discharge of firearms within the City of Harrisburg to firing ranges in educational institutions accredited by the Pennsylvania Department of Education and approved by either the Mayor or Harrisburg Police Chief or a firing range operated by the Bureau of Police;[]
>
> The "Parks Ordinance," Code Section 10-301.13 - originally adopted in 1905 - which prohibits the possession and discharge of firearms within City parks;[]
>
> The "Minors Ordinance," Code Section 3-245.1 - originally adopted in 1951 - which makes it unlawful for unaccompanied minors under the age of 18 to possess firearms outside of their residences in the City of Harrisburg;[]
>
> The "State of Emergency Ordinance," Code Section 3.355.2(A)(1) - originally adopted in 1969 - which prohibits the sale, transfer, or purchase of firearms or ammunition during the period of emergency declaration by the Mayor and further authorizes the Mayor to prohibit the public possession of firearms during such a state of emergency;[] and
>
> The "Lost/Stolen Ordinance," Code Section 3.345.4 - originally adopted in 2009 - which requires firearms owners to report lost or stolen firearms to law enforcement within 48 hours of discovery of the loss or theft.[]

*Firearm Owners Against Crime*, 261 A.3d at 470.

[7]   This could include discharging a firearm outside of a firing range or without governmental approval; discharging or possessing a firearm while in a park in Harrisburg; being an unaccompanied minor with a firearm outside of the minor's residence; selling, transferring, or purchasing firearms or ammunition during a state of emergency (which requires that such a state be declared first); or losing a firearm in Harrisburg and then not reporting the loss of that firearm to the authorities within forty-eight hours. *Firearm Owners Against Crime*, 261 A.3d at 470.

violation of the ordinance; and that the individual was subject to some sort of penalty. Drawing out an immediacy analysis in this manner will make any law seem far too attenuated from the purported harm.

If the policy impacts whether individuals can use medical marijuana to be eligible for treatment courts, then logically the next parties to be impacted are the suppliers of that medical marijuana. We need not spell out every event in between to acknowledge this. Ultimately, this is one step removed. One step removed is certainly not too attenuated for this Court to find that a putative plaintiff has an immediate interest in the matter. Accordingly, I would find that the causal connection between the policy and PCC's interest is sufficiently immediate to establish standing.

## IV. Conclusion

For the foregoing reasons, I would conclude that PCC has standing to pursue its claim against the Judicial District. Accordingly, I dissent.

Justices Wecht and McCaffery join this dissenting opinion.